1 | RUTAN & TUCKER, LLP
Proud Usahacharoenporn (State Bar No. 278204)
2 | pusaha@rutan.com
Briana Richmond (State Bar No. 301824)
3 | brichmond@rutan.com
18575 Jamboree Road, 9th Floor
4 | Irvine, California 92612
Telephone:   714-641-5100
5 | Facsimile:    714-546-9035

6 | Attorneys for Plaintiff
CONSUMERDIRECT, INC.

7 |

8 | UNITED STATES DISTRICT COURT

9 | CENTRAL DISTRICT OF CALIFORNIA

| CONSUMERDIRECT, INC., a Nevada corporation, | Case No.  8:21-cv-01968-(JVS) (KESx) |
|---|---|
| | Honorable James V. Selna |
| | Courtroom 10C |
| Plaintiff, | |
| | **FIRST AMENDED COMPLAINT FOR:** |
| vs | |
| | **1. FEDERAL TRADEMARK INFRINGEMENT [15 U.S.C. § 1114]** |
| PENTIUS, LLC, a Delaware limited liability company; ARRAY US, INC., a Delaware corporation; SYSTEM ADMIN, LLC, a Florida limited liability company; CALLANDOR, LLC, a Delaware limited liability company; CTH SKIN CORP., a Delaware corporation; HOTBILLS, LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive, | **2. VIOLATION OF THE ANTI-CYBERSQUATTING CONSUMER PROTECTION ACT [15 U.S.C. § 1125(d)]** |
| | **3. FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION [15 U.S.C. § 1125(a)]** |
| Defendants. | **4. INTENTIONAL INTERFERENCE WITH CONTRACT** |
| | **5. INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE** |
| | **6. VIOLATION OF CAL. BUS. AND PROFS. CODE § 17200** |
| | **7. COMMON LAW UNFAIR COMPETITION AND TRADEMARK INFRINGEMENT** |
| | **8. UNJUST ENRICHMENT** |
| | **DEMAND FOR JURY TRIAL** |

Rutan & Tucker, LLP
attorneys at law

FIRST AMENDED COMPLAINT

Plaintiff ConsumerDirect, Inc. ("Plaintiff") for its Complaint against defendants Pentius LLC ("Pentius"), Array US, Inc. ("Array"), System Admin, LLC ("System Admin"), Callandor, LLC ("Callandor"), CTH Skin Corp. ("CTH"), and Hotbills, LLC ("Hotbills") and DOES 1 through 10, inclusive (collectively, "Defendants"), alleges as follows:

## NATURE OF ACTION

1.     This action arises out of Defendants' scheme to infringe on Plaintiff's trademarks and domain names, interfere with Plaintiff's contracts and relationships, and unfairly compete with Plaintiff by using unlawful cybersquatting websites, deceptive pricing, and other unfair practices to unlawfully compete with, and to deliberately damage Plaintiff.   Plaintiff seeks injunctive relief, damages, disgorgement, restitution, statutory penalties, punitive damages, attorneys' fees, and costs for trademark infringement, cybersquatting, false designation of origin, intentional interference with contract, intentional interference with prospective economic advantage, violation of California Business and Professions Code section 17200, *et seq*., and common law unfair competition, and unjust enrichment.

## PARTIES

2.     Plaintiff is a Nevada Corporation with its principal place of business at 16795 Von Karman Ave., Suite 230, Irvine CA 92606.  Plaintiff has filed the required "Statement and Designation by Foreign Corporation" with the California Secretary of State in order to do business in California.

3.     On information and belief, Defendant Pentius is a Delaware limited liability company with its registered agent located at 8 The Green, Suite R, Dover, DE and its principal place of business located at 1201 N. Orange Street, Suite 7381, Wilmington, DE 19801.

4.     On information and belief, Defendant Array is a Delaware corporation with its registered agent located at 1209 Orange Street, Wilmington, DE, and its principal place of business located at 6 St. Johns Lane, New York, NY 10013.

5.     On information and belief, Defendant System Admin is a Florida limited liability company with its registered agent located at 7901 4th Street North, Suite 300, St. Petersburg, FL 33702, and its principal place of business located at 2234 N. Federal Highway, Suite 453, Boca Raton, FL 33431.

6.     On information and belief, Defendant Callandor is a Delaware limited liability company with its registered agent located at 1201 Orange St., Suite 600, One Commerce Center, Wilmington, DE 19801.

7.     On information and belief, Defendant CTH is a Delaware corporation with its registered agent located at 108 W. 13th St., Wilmington, DE 19801.

8.     On information and belief, Defendant Hotbills is a Delaware limited liability company with its registered agent located at 2140 S. Dupont Hwy, Camden, DE 19934.

9.     On information and belief, Plaintiff alleges that each of the defendants named herein as Does 1 through 10, inclusive, performed, participated in, or abetted in some manner, the acts alleged herein, proximately caused the damages alleged below, and is liable to Plaintiff for the damages and relief sought herein.

10.    On information and belief, Plaintiff alleges that, in performing the acts and omissions alleged herein, and at all times relevant hereto, each of the defendants was the agent and employee of each of the other defendants and was at all times acting within the course and scope of such agency and employment with the knowledge and approval of each of the other defendants.

11.    The identities of the individuals and entities named as Doe defendants herein are not presently known, but Plaintiff will seek to amend the Complaint to properly identify them when their proper names have been ascertained.

12.    On information and belief, at all times mentioned herein there existed a unity of interest and ownership between Defendants, such that any individuality and separateness among them has ceased, and that Defendants, and each of them, are the alter egos of each other.  On information and belief, Defendants have used the assets

of the Defendants for each of their own purposes and uses and caused the assets of the other Defendants to be transferred to them without adequate consideration and without following corporate formalities.  On information and belief, Defendants have made payments to, and paid the expenses of, one another unrelated to their own respective businesses.

13. On information and belief, Defendants have exercised complete control and dominance over one another, and have failed to follow corporate formalities.  On information and belief, each of the Defendants directly received for themselves the benefits of the transactions described herein and commingled assets and obligations of each other's with their own in contravention of the fiction of their separate existence.  Adherence to the fiction of the separate existence of Defendants as entities distinct from one another would permit an abuse of the corporate privilege and would promote a fraud and/or injustice.

14. Specifically, and without limitation, System Admin, Callandor, CTH, and Hotbills (collectively, the "Alter Ego Defendants") are alter egos of Pentius because in all aspects of the business, these companies actually function as one single entity.  The Alter Ego Defendants are grossly undercapitalized, fail to observe corporate formalities, do not pay any dividends, are insolvent, do not have their own officers and directors (or if they do, they are completely overlapping with Pentius' officers and directors), do not have legitimate corporate records, siphoned funds from Pentius, and are merely a facade for the operations of Pentius.  The Alter Ego Defendants' corporate form was fraudulently abused by Pentius in an attempt to obscure Pentius' involvement in the wrongdoing, as alleged in more detail below.

## JURISDICTION AND VENUE

15. This action arises, in part, under the Lanham Act, 15 U.S.C. section 1114 *et seq.,* section 1125 *et seq.*  This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) & (b), and pendent jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims

1   are joined with substantially related claims under the Lanham Act.

2       16.    This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because

3   the amount in controversy exceeds $75,000 exclusive of interest and costs and is

4   between citizens of different states.

5       17.    This Court has personal jurisdiction over Defendants because, on

6   information and belief, Defendants conduct business in and from this state using

7   interactive websites that infringe on Plaintiff's trademarks and have directed their

8   wrongdoing at Plaintiff in this state as alleged herein.

9       18.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and (3)

10  because a substantial part of the events giving rise to the claims occurred in this

11  District where Plaintiff maintains its principal place of business.

12  **FACTUAL ALLEGATIONS**

13  **A.**    **Background: Plaintiff is an Industry Leader in Credit Report and**

14      **Monitoring Services**

15      19.    Plaintiff is an industry leader in consumer self-help financial services,

16  including credit management, credit reporting services, credit counseling, and credit

17  monitoring since at least 2009.  Plaintiff provides these services through numerous of

18  its own websites such as smartcredit.com, idlock.com, and creditmonitoring.com.

19  Plaintiff also partners with other financial services companies and creates white labels

20  and co-brands for them, which allows Plaintiff's partners to display and utilize

21  Plaintiff's financial services on the partners' websites.  Among other things,

22  Plaintiff's websites offer memberships that allow customers to view and track their

23  credit scores and reports, receive credit alerts, learn about credit, and use tools to

24  resolve any disputed or fraudulent items that appear on the credit report.  Plaintiff also

25  provides identity theft monitoring and financial management tools through its

26  websites.

27      20.    Since at least as early as 2009, and before Defendants used any similar

28  mark, Plaintiff or its predecessor-in-interest has continuously and prominently used

the Marks: (1) "SMARTCREDIT" and "SMARTCREDIT.COM" (the "SMARTCREDIT Marks"); (2) "IDLOCK" and "IDLOCK.COM" (the "IDLOCK.COM Marks"); and (3) CREDITMONITORING.COM (the "CREDITMONITORING Mark") to denote the source of its high-quality products and services. The SMARTCREDIT Marks, the IDLOCK.COM Marks, and the CREDITMONITORING Mark are hereinafter collectively referred to as the "Marks."

21. Plaintiff owns several federal trademark registrations on the United States Patent and Trademark Office's ("USPTO") Principal Register, including for the Mark "SMARTCREDIT" for goods and services in Classes 35, 36, and 42, Registration No. 6068903 dated June 2, 2020 and the Mark "SMARTCREDIT.COM" for goods and services in Classes 35, 36, and 45, Registration No. 3819295 dated July 13, 2010. The Registration Certificates for the SMARTCREDIT Marks are attached hereto as <u>Exhibits 1 and 2</u>. The SMARTCREDIT Marks are valid and subsisting and in full force and effect and constitutes conclusive evidence of Plaintiff's exclusive right to use the SMARTCREDIT Marks throughout the United States with respect to, *inter alia*, consumer self-help financial services.

22. Plaintiff has committed significant amounts of time, effort, and money over the course of more than 12 years to developing a widely-respected reputation through which the Marks have acquired secondary meaning indicating Plaintiff as the source of its high-quality goods and services. Thus, before the acts complained of in this Complaint, members of the general consumer population, including over 4 million consumers who are members of Plaintiff's websites, recognized the Marks as exclusive source identifiers for goods and services relating to consumer self-help financial services as originating from, sponsored, or approved by Plaintiff.

23. On information and belief, Plaintiff has the exclusive right to use the Marks in interstate commerce, and Plaintiff's use has been exclusive since it first adopted the Marks with the exception of unauthorized uses such as by Defendants as described in this Complaint.

24. The Marks are valid and subsisting and remain in full force and effect.

25. Plaintiff has widely advertised, promoted, and sold goods and services under its Marks in numerous and diverse advertising media including print and the internet to promote the strength and renown of its Marks. Plaintiff has achieved a high level of commercial success in selling products and services bearing or sold in connection with its Marks and has built a valuable reputation and substantial goodwill, with which the Marks have become synonymous.

**B.    Defendants Cybersquat on Plaintiff's Websites And Infringe on Plaintiff's Marks**

26. Pentius and Array are competitors of Plaintiff who also provide consumer self-help financial services and create white labels and co-brands for other companies to allow them to display and utilize Pentius and Array's financial services on their websites.

27. Plaintiff recently discovered that Pentius and Array have engaged in a variety of fraudulent, unlawful, and unfair competitive acts directed at Plaintiff and at others in the industry as detailed below. Despite Plaintiff's cease and desist demand, Pentius and Array have failed and refuse to cease their wrongdoing, thus necessitating this lawsuit.

28. Pentius and Array's unfair business practices have been used to interfere with and transfer millions of dollars in business away from Plaintiff's relationships with its partner companies, including but not limited to, Identity Club and its affiliates Arius Group and ID Club, Credit Versio, CreditLife, Novae, and Credit Admiral, which has caused and is continuing to cause Plaintiff harm.

a.    Defendants' Cybersquatting Domains Infringe On Plaintiff's Marks and are Used to Unfairly Compete with Plaintiff

29. After Plaintiff's adoption and use of the Marks, Pentius, through the shell company Alter Ego Defendants, created financial services websites using infringing marks and domain names for the specific purpose of unfairly competing

with Plaintiff.  Array, in collusion with Pentius, operates and provides the application programming interface platform and other services to these websites, knowing them to be infringements of Plaintiff's websites.  Specifically, Pentius (through the Alter Ego Defendants) created and registered the following domain names, among others, which Array operates and uses: (1) smartcreditview.com and smartcreditcollege.com, which are confusingly similar to Plaintiff's website smartcredit.com; (2) theidlock.com, which is confusingly similar to Plaintiff's website idlock.com; and (3) creditmonitoringsolutions.com, propercreditmonitoring.com, credithivemonitor.com, honestcreditmonitoring.com, and creditmonitormaster.com, which are confusingly similar to Plaintiff's website creditmonitoring.com (collectively, the "Cybersquatting Domains").  Upon information and belief, Defendants intentionally created and operated these Cybersquatting Domains, which are confusingly similar to Plaintiff's website domains, with the bad faith intent to profit from the goodwill that Plaintiff has built through its Marks.

30.    Within these confusingly similar websites, Defendants use the marks "smartcreditview," "smartcreditcollege," and "theidlock," (hereinafter collectively referred to as the "Infringing Marks"), which infringe on Plaintiff's SMARTCREDIT Marks and IDLOCK.COM Marks.  Defendants' marketing channels are highly similar to Plaintiff's marketing channels for its own goods and services.

31.    Defendants are currently using the Cybersquatting Domains and Infringing Marks in advertising, offering for sale and selling their financial services, which use began well after Plaintiff's adoption and use of the Marks.  Specifically, smartcreditview.com and creditmonitoringsolutions.com offer memberships that allow customers to view and track their credit scores and reports, receive credit alerts, learn about credit, and use tools to resolve any disputed or fraudulent items that appear on the credit report, similar to what Plaintiff's smartcredit.com and

creditmonitoring.com do; smartcreditcollege.com offers a membership and sells a course book to educate customers about credit and ways to improve credit, similar to what Plaintiff's smartcredit.com does; theidlock.com offers a membership to a product that scans for potential identity theft and fraud, alerts customers of any suspicious activity, and assist with defending against and countering any identified threats, similar to what Plaintiff's idelock.com does.

32.     Defendants are not authorized to use the Cybersquatting Domains or Infringing Marks, or any domains or marks confusingly similar to the Marks in connection with their goods and services, nor are Defendants affiliated with Plaintiff.

33.     Given the distinctive nature of the Marks, Defendants' use of the Cybersquatting Domains and Infringing Marks, is likely to cause confusion, mistake and deception such that members of the public are likely to be confused as to the affiliation, connection or relationship between Plaintiff and Defendants, and confused into believing Defendants' goods and services are endorsed by, sponsored by, or affiliated with Plaintiff when they are not.

34.     In fact, Defendants' Cybersquatting Domains and Infringing Marks have already led to substantial consumer confusion.  Plaintiff has received numerous phone calls and written inquiries from consumers complaining and demanding refunds and the closing of their accounts, but upon further inquiry it was discovered that they signed up for membership with one of Defendants' Cybersquatting Domains and not one of Plaintiff's websites.

35.     Especially given all of Defendants' other unlawful activities as alleged herein, any perceived association by consumers or the industry between Defendants' websites and Plaintiff causes direct harm to Plaintiff.

36.     Plaintiff sent a cease and desist letter to Defendants on November 15, 2021, but Defendants refused to stop using the Cybersquatting Domains and Infringing Marks.  Defendants have continued to refuse to cease and desist from use

1  of the Cybersquatting Domains and Infringing Marks, continuing the financial
2  injury and damages to Plaintiff in an amount to be determined and rendering
3  Defendants' acts in violation of the Lanham Act willful.  As such, this is an
4  exceptional case within the meaning of the Lanham Act, 15 U.S.C. section 1117,
5  thereby entitling Plaintiff to damages, attorneys' fees, and costs.

6      37.    Plaintiff seeks injunctive relief to halt the irreparable harm caused by
7  Defendants' online and other advertising of financial services in a manner that
8  infringes the Marks.  Without an injunction, Defendants will continue to offer
9  financial services using domain names and websites that infringe on the Marks.

10              b.  Defendants Create And Market Other Cybersquatting Websites

11      38.    Pentius and Array also pre-create various turn-key cybersquatting
12  websites, including copycat websites of nationally known and trademarked brands,
13  and market these copycat websites to Plaintiff's partners such as CreditLife, with
14  whom Plaintiff had an existing agreement and relationship, as an incentive to stop
15  doing business with Plaintiff.  Pentius and Array have presented these turn-key
16  copycat websites to Plaintiff's partners and represent, among other things, that
17  Plaintiff's partners can simply select from one of many premade websites that are
18  ready to go, while concealing crucial information, such as that the premade websites
19  are illegal copycats of other brands, and that permission has not been granted to
20  Pentius and Array to use these third parties' protected trademarks and other
21  intellectual property depicted in the premade websites.

22      39.    For example, Daniel Wilson, a representative of Array (working in
23  conjunction with Pentius, who registered these domains), marketed turn-key copycat
24  websites such as 3bcreditscore.com, 3bcreditscores.com, 3bcreditshield.com,
25  3bcreditwatch.com, credilifeguard.com, credilifelock.com, creditlifelock.com, and
26  my800creditshield.com to CreditLife, without informing CreditLife that these are
27  actually copycat domains of other protected domains such as lifelock.com and
28  contain infringing marks within the websites.  By concealing this information from

CreditLife and offering the unfair pricing as detailed further below, CreditLife ultimately decided to divert its business, at least in part, to Array and Pentius instead of to Plaintiff.

40.     On information and belief, Pentius created and registered (through the Alter Ego Defendant and other such shell companies) and with knowledge of the infringement Array operates, or has operated, the following copycat websites in addition to the Cybersquatting Domains, among others: (1) wisecreditkarma.com, a copycat of Credit Karma's creditkarma.com; (2) myficofuture.com, a copycat of myfico.com; (3) mycreditbliss.com, a copycat of creditbliss.com; (4) myfreecreditscoresnow.com, a copycat of myfreescorenow.com; (5) creditlifelock.com, a copycat of Norton's lifelock.com; (6) 3bcreditwatch.com, a copycat of Experian's creditwatch.com; and (7) truecreditview.com, a copycat of TransUnion's truecredit.com.[1]

        c.   <u>Defendants Attempt To Conceal Their Involvement With The Copycat Websites</u>

41.     On information and belief, Pentius has set up a network of shell companies, including the Alter Ego Defendants, to register these copycat websites in an attempt to hide its and Array's involvement, and then attempted to further hide

---

[1]   Other such copycat websites include, but are not limited to: myscore.com, checkfreescore.com, clickfreescore.com, clickyourscores.com, identityprotect.com, secure.freescoreconnect.com, checkcredittoday.com, creditcosmo.com, creditscorefun.com, creditscoresforme.com, freecreditscoreseeker.com, getidentityprotect.com, goldencreditscores.com, goldfew.com, mycreditcosmo.com, scorehug.com, 3goldencreditscores.com, freescoreclick.com, havisant.com, lovemyscores.com, ocuseek.com, procredit.com, tenchant.com, tenzant.com, and trontus.com.  Defendants are constantly deactivating and reactivating their websites, likely in recognition of the illegality of their websites and/or in response to red flags that many in the industry have raised about their legitimacy.  For example, Defendants' websites wisecreditkarma.com and truecreditview.com appear to have been taken down completely as of November 1, 2021 but are now live again as of November 14, 2021 and continue to be live as of January 17, 2022.

the existence of the shell companies by recently taking all mention of these shell companies off of the websites. For example, creditmonitoringsolutions.com used to state that a shell company, "Callandor, LLC" was the "proud owner of this website," but it has now been changed to state that "creditmonitoringsolutions.com is the proud owner of this website" in an attempt to conceal the website's connection to the shell company. Smartcreditview.com used to state that a shell company, "CTH Skin Corp." was the "proud owner of this website," but it has now been changed to state that "smartcreditview.com is the proud owner of this website." Theidlock.com used to state that "Hotbills LLC is the proud owner of this website" but now states that "theidlock.com is the proud owner of this website." Additionally, the other copycat websites are, or were before the ownership information was deliberately concealed, portrayed as being owned by a different company; i.e., checkfreescore.com (UU Marketing), 3freeonlinescores.com (Qualfour, LLC), 3gldscr.com (Golden Few LLC), as well as many others.

42.     These "owners" of the websites are shell companies that exist for no purpose other than as a vehicle for fraud to obfuscate Pentius' involvement. For example, they each have an associated address that appears to be unoccupied residences or addresses of other unassociated businesses; i.e., Callandor's address was identified as 343 E. 30th St., Apt. 6E, New York, NY 10016, which is a residence and CTH's address was identified as 4091 Wooster Dr., Oceanside, CA, which is a residence. There does not seem to be any records or information available regarding these shell corporations, i.e., any corporate websites or associated employees.

43.     To the extent any individuals can be traced to the shell companies, the random persons identified as associated with the companies are not qualified to be running credit report and monitoring businesses. For example, truecreditview.com was registered to an individual by the name of Brett Horan, who is related to other individuals identified as the registered owners of other copycat websites. Mr. Horan

1   has a longstanding career in the landscaping business, which is actively and

2   currently being promoted on his social media account, yet he has no experience

3   whatsoever in the credit report or monitoring industry or anything similar.  This

4   demonstrates that these individuals are being used by Pentius and Array to obfuscate

5   ownership of the shell companies.

6   　　　　44.　　Despite Pentius and Array's attempts to hide their involvement,

7   Plaintiff is informed and believes that Pentius and Array are behind each of these

8   copycat websites and shell companies because the websites all share similar ASN

9   and IP addresses tracing back to Defendant System Admin, LLC, which is owned by

10   Michael LaSala, who is a Director of Pentius and files all of Pentius' annual reports.

11   Defendant System Admin is also a shell company because it reported to the Federal

12   Communications Commission that it does not provide any telecommunications

13   services as of July 26, 2019, yet still holds the registrations to all of the copycat

14   websites.  Many of the shell companies under which the websites are operated are

15   also connected to Mr. LaSala.  Moreover, there are substantial similarities between

16   all of the copycat websites, including nearly identical footers and member services

17   and contact us pages.  Pentius, Array, and all of the copycat websites share identical

18   privacy policies that are copied nearly word for word.  On information and belief,

19   Pentius directly manages over 450 of these copycat websites[2] that have been

20   established by Mr. LaSala.  System Admin's CEO is Martin Toha, who is also the

21   founder and executive of Pentius and Array.  The CTO for Array is Phillip Zedalis,

22   who is also the Director of Development at Pentius.  Array stated in a publically-

23   available video that it is a "spin-off" of Pentius.

24   　　　　45.　　As further evidence that Pentius and Array are behind these copycat

25   _____

26   [2]　　These include, but are not limited to these strange and nefarious website names:
SVCRT.com, CRDFX.com, GETIDP.com, CHKSCR.com, CRSCR.com,

27   CSFRME.com, SCRHUG.com, CSMBLT.com, GFW*3GLDSCR.com,
GLDSCR.com, RPTMYSCORE.com, SRVTS.com, GLDFEW.com,

28   SCRSHIN.com, SCRSWT.com, SCRZNI.com, and SCCRSH.com.

websites, on approximately April 14, 2020, Plaintiff received an online inquiry from Paul Quintal asking about Plaintiff's products, before Plaintiff learned of the copycat websites. Mr. Quintal represented that he worked for an online marketing company called Credmo that operated a website called identityprotect.com, which bore all the same markings as the other copycat websites. The address listed for contact of identityprotect.com was 445 Dexter Ave., Suite 4050, Montgomery, Alabama, which was an executive suite maintained by Regis, an unrelated business. Upon further investigation, Mr. Quintal was identified as the EVP and COO for Pentius. Plaintiff is informed and believes that Mr. Quintal contacted Plaintiff in order to obtain information about Plaintiff to use in their scheme described herein.

46.    Plaintiff and others have demanded that Defendants cease and desist these unlawful activities of creating copycat websites and using them to unfairly compete, but Defendants have refused.

**C.    Defendants Engage In Other Acts Of Unfair Competition**

a. Defendants Communicate False Information About Plaintiff to Plaintiff's Partners

47.    On information and belief, Pentius and Array falsely told partners of Plaintiff that Plaintiff provides consumers with outdated credit reports that are up to two weeks old, in an attempt to divert the partners' business from Plaintiff to Pentius and Array's websites. These representations are false, and Defendants have no basis for believing them to be true.

b. Defendants Engage In Unfair Competition Relating to Merchant Processing Accounts

48.    On information and belief, Pentius and Array fail to timely answer their customer service lines in response to requests to cancel memberships, which has resulted in an alarming number of chargebacks. Rather than dealing with consumer calls and resulting chargebacks in a proper manner required by Card Processing

Networks, Pentius and Array created hundreds of merchant processing accounts[3] using their hundreds of fraudulent shell corporations and hundreds of fraudulent websites in an attempt to hide the significant consumer service and chargeback problems.  These merchant processor accounts have also been set up under various names of friends and families of those associated with Defendants to further conceal ownership of these issues.

49.   For example, a member of Defendants' smartcreditview.com copycat website reported that their credit card was charged by three different merchant processors under three different website names for their smartcreditview.com membership fees using the billing names of smartcreditviewcom, scorechecksecurecom, and mycreditviewercom over the course of just six consecutive months.

> c.   Defendants Deceptively Market "3B Reports" And Circumvent Industry Standards.

50.   It is industry standard for credit report companies such as Plaintiff and Defendants to pay different prices to the credit reporting agencies depending on whether they are purchasing: (1) individual credit reports from one credit reporting agency; or (2) 3-Bureau Credit Reports ("3B Reports") that combine credit reports from the three main credit reporting agencies ("CRAs").  This is because the three main CRAs have reciprocity agreements between them that require them to pay each other when using another's data within 3B Reports.  As such, as a uniform rule across the industry, these three main CRAs cannot sell 3B Reports to credit report companies at below a certain minimum cost as set by the costs they have to pay each other.  In order to ensure that credit report companies purchasing data from the

---

[3]   The merchant processing IDs include, but are not limited to: Norscore LLC, CredCall LLC, Norscore Inc., GoldenFew LLC, Golden Scores LLC, Tanasie Scores LLC, Identech LLC, Repairtech LLC, Reportech LLC, Cosemblant LLC, and Promeritum Limited.

CRAs do not try to circumvent these higher 3B Reports costs by purchasing credit reports separately from each CRA and combining them into a "3B Report" package, each of the CRA's standard contracts require credit report companies to pay the higher 3B Reports price even if the credit reporting companies purchase individual credit reports for the purpose of presenting them as 3B Reports or the equivalent.

51.     Pentius and Array circumvented these requirements by purchasing credit reports individually, at lower prices, and then packaging them together and selling them to consumers as "3B Reports" at prices substantially lower than the established 3B Reports costs that all other credit companies are bound to pay, in violation of the CRA's rules and industry standard.  Defendants have thus deceptively presented these 3B Reports to consumers as legitimate 3B Reports, when, in fact, they are not legitimate and not sanctioned by the CRAs.  Furthermore, Defendants employ sophisticated measures to deliberately obfuscate this conduct. For example, Array uses credit reports that are purchased through Pentius from the CRAs in order to hide from the CRAs that they are circumventing the 3B Reports pricing.  Such conduct is prohibited by industry standards and the effects of such conduct is to significantly threaten or harm competition because Defendants are selling 3B Reports at prices that are significantly lower than all other credit companies' costs.

            d.  Defendants Engage In Fraud and Misrepresentation Relating to
                Relationships with CRAs

52.     Pentius and Array misrepresented in marketing materials and in recent publicly available video footage that Array purchases products directly from the all three main CRAs, but Array does not have valid contracts directly with all three CRAs and is likely using Pentius' relationships with those CRAs.  For those CRAs that Defendants do have any relationship with, Defendants are violating the terms of those relationships by fraudulently ordering credit reports and misclassifying the use thereof as 3B Reports, as detailed above.

   e. <u>Defendants Fraudulently and Improperly Resell Consumer</u>
    <u>Information</u>

53. Pentius and Array also admitted in recent publicly available video footage to sharing raw consumer data freely with third parties.  On information and belief, Defendants' websites send full, raw, and unredacted credit report data to third parties.  This use of consumer data is fraudulent, improper, and unfair given Defendants make specific representations to consumers about the privacy and use of their personal information, and presumably have provided contractual assurances that match industry standards stating that they will not share consumer information with anyone other than the consumer to whom it pertains.  This conduct also violates the GLB Privacy Rule and Safeguards Rule by failing to properly advise consumers about how their personal information is processed.

   f. <u>Defendants Fail to Safeguard and Secure Consumer Information</u>

54. On information and belief, Pentius and Array fail to employ meaningful security controls to adequately protect the confidentiality, integrity, and availability of the sensitive personal information of consumers.  Within Defendants' website, there are multiple references to Payment Card Industry Data Security Standards ("PCI") for transferring and storing credit report data, yet no further evidence of Defendants actually obtaining PCI compliance is shown within the site.  Moreover, PCI is the authority that upholds the standards for credit card and payment processing data practices, and not the storing of credit report data.  Defendants also represent that their websites are secured by McAfee, when, in fact, they are not.  The use of these terms is an attempt, by Defendants, to misrepresent the security of the credit report data sharing and lack of proper data storing practices.

55. Defendants websites also have a list of APIs that lacks meaningful security because they do not limit the delivery of the credit data, therefore allowing the data to be stored by each third-party partner in an unregulated method.  The failure to have proper security measures in place puts consumers and other providers

attorneys at law

2530/102119-0036
17320986

FIRST AMENDED COMPLAINT
-17-

1   at risk of data breaches, in violation of various protections such as the Gramm-

2   Leach-Bliley Act (16 C.F.R. § 314.3), Cal. Civ. Code § 1798.81.5, and Cal. Civ.

3   Code § 1798.150.

4                **g.**  <u>Defendants Fail To Comply With Applicable Laws &</u>

5                       <u>Regulations</u>

6        56.    Defendants fail to comply with some of the most basic laws &

7   regulations, for example, Defendants operate numerous websites with no service of

8   process contact information in violation of Cal Corporations Code § 1502; operate

9   websites with no working or viable contact information in violation of Civil Code

10  §§ 1798.83 and 1798.130; operate websites (including the copycats of Plaintiff's

11  websites) with Terms & Conditions and Privacy links that do not work in

12  violation of Cal Bus. And Prof. Code § 22575 *et seq.*; and list data sharing practices

13  that directly conflict with the California Consumer Privacy Act and other such

14  similar regulations, with which the websites falsely claim compliance.

15                     **<u>FIRST CAUSE OF ACTION</u>**

16  **Federal Trademark Infringement Against Pentius, Array, System Admin, and**

17                            **CTH Skin Corp.**

18                         **[15 U.S.C. § 1114]**

19       57.    Plaintiff repeats and incorporates by this reference each and every

20  allegation contained in each of the preceding paragraphs, inclusive, as though set

21  forth in full.

22       58.    By the acts and omissions set forth above, Pentius, Array, System

23  Admin, and CTH Skin Corp. have infringed and continue to infringe Plaintiff's

24  federally registered trademark rights in violation of Section 32 of the Lanham Act,

25  15 U.S.C. section 1114.  Pentius, Array, System Admin, and CTH Skin Corp.'s

26  conduct and use of the SMARTCREDIT Marks or marks confusingly similar to the

27  SMARTCREDIT Marks is likely to cause confusion, mistake, and deception among

28  the general purchasing public as to the affiliation, connection, association, origin,

sponsorship or approval of their goods and services, and interfere with Plaintiff's ability to use its SMARTCREDIT Marks to indicate a single quality control source of goods and services.

59.     Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury for which Plaintiff has no adequate remedy at law.  Plaintiff is therefore entitled to a preliminary and permanent injunction against further infringing conduct by Pentius, Array, System Admin, and CTH Skin Corp.

60.     Pentius, Array, System Admin, and CTH Skin Corp. have profited and are profiting by such infringement and Plaintiff has been, and is being, damaged by such infringement.  Plaintiff is therefore entitled to recover damages from Pentius, Array, System Admin, and CTH Skin Corp. in an amount to be proved at trial as a consequence of their infringing activities.

61.     Plaintiff sent a cease and desist letter to Defendants on November 15, 2021, but Defendants refused to stop using the Infringing Marks.  Pentius, Array, System Admin, and CTH Skin Corp. have continued to refuse to cease and desist from use of the Infringing Marks, causing financial injury and damages to Plaintiff in an amount to be determined and rendering their acts in violation of the Lanham Act willful.  As such, this an exceptional case within the meaning of the Lanham Act, 15 U.S.C. section 1117, thereby entitling Plaintiff to damages, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION

### Violation of the Anti-Cybersquatting Consumer Protection Act Against All Defendants

### [15 U.S.C. § 1125(d)]

62.     Plaintiff repeats and incorporates by this reference each and every allegation contained in each of the preceding paragraphs, inclusive, as though set forth in full.

63.     Defendants' acts as alleged herein with respect to their Cybersquatting

1  Domains constitute a violation of the Anti-Cybersquatting Consumer Protection Act,
2  15 U.S.C. § 1125(d).

3       64.    As alleged above, Plaintiff has valid and subsisting ownership rights in
4  the Marks, which marks are distinctive and famous.

5       65.    Defendants' aforesaid use of the Cybersquatting Domains is likely to
6  cause confusion, or to cause mistake, or to deceive as to the affiliation, connection,
7  or association of Defendants with Plaintiff, or as to the origin, sponsorship, or
8  approval of Defendants' goods and services, in that purchasers are likely to believe
9  that Plaintiff authorizes or controls the advertising, offering, or sale of Defendants'
10  goods and services described above, or that Defendants are associated with or
11  authorized by Plaintiff to advertise, offer, or sell those goods and services.

12       66.    Defendants use the Cybersquatting Domains with a bad faith intent to
13  profit from the distinctiveness and goodwill of Plaintiff's Marks.

14       67.    Defendants' conduct constitutes violations of the Anti-Cybersquatting
15  Consumer Protection Act that has violated, and unless restrained and enjoined by
16  this Court will continue to violate, Plaintiff's rights to its domain names, and has
17  caused irreparable harm, damage, and injury to Plaintiff's goodwill and business
18  reputation.

19       68.    Plaintiff has been and continues to be irreparably injured as a result of
20  Defendants' infringement and wrongful acts and has no adequate remedy at law.
21  Plaintiff is therefore entitled to a permanent injunction requiring Defendants to
22  forfeit and cancel the Cybersquatting Domains.  Plaintiff is further entitled to
23  statutory damages under the Anti-Cybersquatting Consumer Protection Act.

24       69.    Plaintiff sent a cease and desist letter to Defendants on November 15,
25  2021, but Defendants refused to stop using the Cybersquatting Domains.
26  Defendants have continued to refuse to cease and desist from use of the
27  Cybersquatting Domains, causing financial injury and damages to Plaintiff in an
28  amount to be determined and rendering Defendants' acts willful.  As such, this an

Rutan & Tucker, LLP
*attorneys at law*

exceptional case entitling Plaintiff to damages, attorneys' fees, and costs.

## THIRD CAUSE OF ACTION

**False Designation of Origin and Unfair Competition Against All Defendants**

**Except Callandor**

**[15 U.S.C. § 1125(a)]**

70.     Plaintiff repeats and incorporates by this reference each and every allegation contained in each of the preceding paragraphs, inclusive, as though set forth in full.

71.     Defendants' acts as alleged herein also constitute false designation of origin and unfair competition in violation of Lanham Act section 43(a), 15 U.S.C. section 1125(a).

72.     Defendants' aforesaid advertising, offering for sale, and sale of services in connection with the Infringing Marks is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendants with Plaintiff, or as to the origin, sponsorship, or approval of Defendants' goods and services, in that purchasers are likely to believe that Plaintiff authorizes or controls the advertising, offering, or sale of Defendants' goods and services described above, or that Defendants are associated with or authorized by Plaintiff to advertise, offer, or sell those goods and services.

73.     Defendants' use in commerce of Plaintiff's SMARTCREDIT Marks and IDLOCK.COM Marks, or marks confusingly similar to those marks, in connection with Defendants' services constitutes a false designation of the origin and/or sponsorship of such services, and falsely describes and represents such services.

74.     Defendants' conduct constitutes unfair competition that has violated, and unless restrained and enjoined by this Court will continue to violate, Plaintiff's trademark rights, and has caused irreparable harm, damage, and injury to Plaintiff's goodwill and business reputation.

75.     Plaintiff has been and continues to be irreparably injured as a result of Defendants' infringement and wrongful acts and has no adequate remedy at law. Plaintiff is therefore entitled to a permanent injunction against further infringing and unlawful conduct by Defendants.

76.     Defendants have profited and are profiting by such infringement and Plaintiff has been and is being damaged by such infringement.  Plaintiff is therefore entitled to recover damages from Defendants in an amount to be proved at trial as a consequence of Defendants' infringing and unlawful activities.

77.     Plaintiff sent a cease and desist letter to Defendants on November 15, 2021, but Defendants refused to stop using the Infringing Marks.  Defendants have continued to refuse to cease and desist from use of the Infringing Marks, causing financial injury and damages to Plaintiff in an amount to be determined and rendering Defendants' acts in violation of the Lanham Act willful.  As such, this an exceptional case within the meaning of the Lanham Act, 15 U.S.C. section 1117, thereby entitling Plaintiff to damages, attorneys' fees, and costs.

### FOURTH CAUSE OF ACTION

**Intentional Interference With Contract Against Pentius and Array**

78.     Plaintiff repeats and incorporates by this reference each and every allegation contained in each of the preceding paragraphs, inclusive, as though set forth in full.

79.     Plaintiff had valid contracts with partner companies such as, but not limited to, Identity Club and its affiliates Arius Group and ID Club, Credit Versio, CreditLife, Novae, and Credit Admiral to which Defendants were not a party, which were likely to bring future economic benefit to Plaintiff.

80.     Pentius and Array solicited business from each of these third parties, knowing them to be partners of Plaintiff with active contracts.  Pentius and Array, with the intent to interfere with Plaintiff's contract, caused actual disruptions to Plaintiff's contracts with these third parties by diverting their business away from

Plaintiff and to Pentius and Array by, among other things, offering unfair 3B Reports prices and turn-key copycat websites (without telling the third parties that the websites violated other companies' protected domain rights), as further alleged above.  Pentius and Array's conduct was further wrongful given their failure to comply with security standards and other regulations as detailed above.

81.     At the time of these actions, Pentius and Array knew these third parties to be partners of Plaintiff because it is patently obvious from looking at the third parties' websites that they are associated with Plaintiff.  For example, Credit Versio and Novae are cobrands of Plaintiff, so their websites had domain names that started with smartcredit.com, i.e., smartcredit.com/novae and smartcredit.com/creditversio. Identity Club is a white label[4] of Plaintiff's, and Plaintiff's product as displayed on all of its white labels is unique because it contains patented action buttons that connect consumers directly to their creditors to address credit issues and is the only such product that contains a horizontal sliding credit report.  Credit Admiral had a referral relationship with Plaintiff wherein their website would direct users to Plaintiff's smartcredit.com website.  These actions, coupled with their use of the Infringing Marks and the Cybersquatting Domains, make clear that Pentius and Array intentionally interfered with Plaintiff's partners.

82.     Defendants' misconduct is the direct and proximate cause of damages to Plaintiff.  For example, before Identity Club began contracting with Pentius and Array, Identity Club paid Plaintiff approximately $400,000 a month in fees, which decreased to below $160,000 a month and continues to decrease since they began working with Pentius and Array, amounting to well over $1 million in damages to Plaintiff from the disruption of that relationship alone through the filing of this complaint, which damages continue to accrue.

83.     Plaintiff is entitled to compensatory damages in an amount to be

---

[4]   A white label is a product or service provided by one company (Plaintiff) to other companies for use on the other companies' websites.

1  determined at trial as well as disgorgement of all revenues and profits associated

2  with Defendants' interference.

3       84.    Defendants' misconduct was malicious, oppressive, and in reckless

4  disregard of Plaintiff's rights under California law.  Actual harm has been inflicted

5  on Plaintiff as a result of that misconduct, and Plaintiff is therefore entitled to an

6  award of punitive damages in an amount sufficient to punish Defendants for their

7  actions.

8       85.    Plaintiff has been and continues to be irreparably injured as a result of

9  Defendants' interference and has no adequate remedy at law.  Plaintiff is therefore

10  entitled to a permanent injunction against further interference by Defendants.

11  **<u>FIFTH CAUSE OF ACTION</u>**

12  **Intentional Interference With Prospective Economic Advantage Against**

13  **Pentius and Array**

14       86.    Plaintiff repeats and incorporates by this reference each and every

15  allegation contained in each of the preceding paragraphs, inclusive, as though set

16  forth in full.

17       87.    Plaintiff had valid contracts with partner companies such as, but not

18  limited to, Identity Club and its affiliates Arius Group and ID Club, Credit Versio,

19  CreditLife, Novae, and Credit Admiral to which Defendants were not a party, which

20  were likely to bring future economic benefit to Plaintiff.

21       88.    Pentius and Array solicited business from each of these third parties,

22  knowing them to be partners of Plaintiff with active contracts.  Pentius and Array,

23  with the intent to interfere with Plaintiff's contract, caused actual disruptions to

24  Plaintiff's contracts with these third parties by diverting their business away from

25  Plaintiff and to Pentius and Array by, among other things, offering unfair 3B

26  Reports prices and turn-key copycat websites (without telling the third parties that

27  the websites violated other companies' protected domain rights), as further alleged

28  above.  Pentius and Array's conduct was further wrongful given their failure to

comply with security standards and other regulations as detailed above.

89.     At the time of these actions, Pentius and Array knew these third parties to be partners of Plaintiff because it is patently obvious from looking at the third parties' websites that they are associated with Plaintiff.  For example, Credit Versio and Novae are cobrands of Plaintiff, so their websites had domain names that started with smartcredit.com.  Identity Club is a white label of Plaintiff's, and Plaintiff's product as displayed on all of its white labels is unique because it contains patented action buttons that connect consumers directly to their creditors to address credit issues and is the only such product that contains a horizontal sliding credit report. Credit Admiral had a referral relationship with Plaintiff wherein their website would direct users to Plaintiff's smartcredit.com website.

90.     Defendants' misconduct is the direct and proximate cause of damages to Plaintiff.  For example, before Identity Club began contracting with Pentius and Array, Identity Club paid Plaintiff approximately $400,000 a month in fees, which decreased to below $160,000 a month since they began working with Pentius and Array, amounting to well over $1 million in damages to Plaintiff from the disruption of that relationship alone.

91.     Plaintiff is entitled to compensatory damages in an amount to be determined at trial as well as disgorgement of all revenues and profits associated with Defendants' interference.

92.     Defendants' misconduct was malicious, oppressive, and in reckless disregard of Plaintiff's rights under California law.  Actual harm has been inflicted on Plaintiff as a result of that misconduct, and Plaintiff is therefore entitled to an award of punitive damages in an amount sufficient to punish Defendants for their actions.

93.     Plaintiff has been and continues to be irreparably injured as a result of Defendants' interference and has no adequate remedy at law.  Plaintiff is therefore entitled to a permanent injunction against further interference by Defendants.

## SIXTH CAUSE OF ACTION

**Unfair Competition per Cal. Business & Professions Code § 17200 Against All Defendants**

94.     Plaintiff repeats and incorporates by this reference each and every allegation contained in each of the preceding paragraphs, inclusive, as though set forth in full.

95.     Plaintiff has suffered injury in fact and has lost money as a result of Defendants' unfair competition, including by losing partners such as, but not limited to, identityclub.com and its affiliates ariusgroup.com & idclub.com, and therefore has standing to pursue this claim.

96.     Defendants' conduct and actions as alleged herein, including without limitation Defendants' trademark infringement, cybersquatting, copycat websites, unfair pricing, fraud on the public, and violation of other laws as detailed above, constitute unfair, unlawful, and fraudulent conduct.  Defendants have no valid or legitimate purpose for such conduct except to unfairly benefit Defendants at Plaintiff's expense.

97.     Plaintiff is entitled to restitutionary damages and because Defendants are likely to continue with their unlawful conduct absent an injunction, Plaintiff is entitled to a preliminary and permanent injunction.

## SEVENTH CAUSE OF ACTION

**Common Law Unfair Competition Against All Defendants**

98.     Plaintiff repeats and incorporates by this reference each and every allegation contained in each of the preceding paragraphs, inclusive, as though set forth in full.

99.     Plaintiff has suffered injury in fact and has lost money as a result of Defendants' unfair competition, including by losing partners such as, but not limited to, identityclub.com and its affiliates ariusgroup.com & idclub.com, and therefore has standing to pursue this claim.

100.   Defendants' conduct and actions as alleged herein, including without limitation Defendants' trademark infringement, cybersquatting, copycat websites, unfair pricing, fraud on the public, and violation of other laws as detailed above, constitute unfair, unlawful, and fraudulent conduct.  Defendants have no valid or legitimate purpose for such conduct except to unfairly benefit Defendants at Plaintiff's expense.

101.   Plaintiff is entitled to restitutionary damages and because Defendants are likely to continue with their unlawful conduct absent an injunction, Plaintiff is entitled to a preliminary and permanent injunction.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment Against All Defendants

102.   Plaintiff repeats and incorporates by this reference each and every allegation contained in each of the preceding paragraphs, inclusive, as though set forth in full.

103.   Defendants' wrongful acts unjustly enriched Defendants by allowing them to avoid the time and cost of lawfully conducting their business and abiding by industry standards, laws, and regulations that other credit reporting companies must abide by.

104.   On information and belief, Defendants' wrongful acts unjustly enriched Defendants by allowing them to wrongfully benefit from years of effort and experience by simply copying Plaintiff's intellectual property and diverting business from Plaintiff.

105.   Defendants' misconduct is the direct and proximate cause of damages to Plaintiff, and Plaintiff is entitled to compensatory damages in an amount to be determined at trial, as well as disgorgement of all revenues and profits associated with Defendants' wrongdoing.

1

## **PRAYER FOR RELIEF**

2   WHEREFORE, Plaintiff prays for an order and judgment against Defendants

3   as follows:

4   1.   For an Order that Defendants, and each of them, their owners, partners,

5   agents, servants, distributors, affiliates, employees, representatives, and all those in

6   privity or acting in concert with Defendants or on their behalf, be permanently

7   enjoined and restrained from, directly or indirectly:

8   a.   Selling, offering to sell, advertising, displaying, or using the

9   Infringing Marks, or any derivative thereof or any other mark similar thereto, alone

10   or in combination with other words, names, styles, titles, designs or marks in

11   connection with the sale, advertising, marketing and promotion of their financial

12   services;

13   b.   Operating or otherwise providing services to the Cybersquatting

14   Domains or any derivative thereof or any other websites similar thereto, alone or in

15   combination with other words, names, styles, titles, designs or marks in connection

16   with the sale, advertising, marketing and promotion of their financial services;

17   c.   Creating or operating or providing services to any further

18   copycat websites of Plaintiff's websites;

19   d.   Extorting or attempting to extort Plaintiff's partners with use of

20   any copycat websites or other similar harmful or threatening tactics;

21   e.   Making any further false statements about Plaintiff;

22   f.   Purchasing individual credit reports for the purpose of

23   deceptively packaging them as 3B Reports or the equivalent;

24   g.   Making any further false statements about Defendants'

25   relationships with the CRAs;

26   h.   Sharing consumer credit report information with third parties

27   without the consumers' express permission;

28   i.   Operating financial self-help websites with insufficient security

1  measures; and

2           j.      Creating and using multiple merchant processing accounts for

3  each website in an attempt to conceal chargebacks and customer service

4  deficiencies.

5      2.      For an order requiring Defendants to deliver to Plaintiff's attorneys

6  within thirty (30) days after the entry of any injunction, to be impounded or

7  destroyed by Plaintiff, all graphics, literature, signs, labels, prints, packages,

8  wrappers, containers, advertising and promotional materials, products and any other

9  written materials or items in Defendants' possession or control that bear the

10  Infringing Marks, or any other mark similar thereto, together with all means and

11  materials for making or reproducing the same, pursuant to 15 U.S.C. section 1118,

12  and other applicable laws;

13      3.      For an order requiring Defendants to permanently deactivate the

14  Cybersquatting Domains and any other websites that are derivative thereof or use

15  other mark similar thereto, alone or in combination with other words, names, styles,

16  titles, designs or marks in connection with the sale, advertising, marketing and

17  promotion of their financial services;

18      4.      For an order requiring Defendants to file with the Clerk of this Court

19  and serve Plaintiff, within thirty (30) days after the entry of any preliminary or

20  permanent injunction, a report in writing, under oath, setting forth in detail the

21  manner and form in which Defendants have complied with 1 through 3 above;

22      5.      For an award of Defendants' profits and Plaintiff's damages according

23  to proof at trial;

24      6.      For an order requiring Defendants to account for and pay to Plaintiff all

25  gains, profits and advantages derived by Defendants from the unlawful activities

26  alleged herein, and/or as a result of unjust enrichment;

27      7.      For statutory penalties;

28      8.      For an award of pre-judgment interest at the highest rate allowed by

law;

9.     For punitive damages;

10.    For restitution;

11.    For an award of Plaintiff's attorneys' fees, costs and expenses, including but not limited to expert witness fees, incurred in this action, pursuant to 15 U.S.C. section 1117 and any other applicable statutes; and

12.    For such further relief as this Court shall deem just and proper.


Dated:  January 18, 2022                    Respectfully submitted

                                            RUTAN & TUCKER, LLP


                                            By:  */s/ Proud Usahacharoenporn*
                                                 Proud Usahacharoenporn
                                                 Attorneys for Plaintiff
                                                 ConsumerDirect, Inc.

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial

3     on all claims which are triable to a jury in this action.

4

5     Dated:  January 18, 2022                              RUTAN & TUCKER, LLP

6

7                                                    By: */s/ Proud Usahacharoenporn*
                                                         _____
8                                                        Proud Usahacharoenporn
                                                         Attorneys for Plaintiff
9                                                        ConsumerDirect, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rutan & Tucker, LLP
*attorneys at law*

2530/102119-0036
17320986

FIRST AMENDED COMPLAINT