RUTAN & TUCKER, LLP
Proud Usahacharoenporn (State Bar No. 278204)
pusaha@rutan.com
Briana Richmond (State Bar No. 301824)
brichmond@rutan.com
18575 Jamboree Road, 9th Floor
Irvine, California 92612
Telephone:   714-641-5100
Facsimile:    714-546-9035

Attorneys for Plaintiff
CONSUMERDIRECT, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMERDIRECT, INC., a Nevada corporation,<br><br>              Plaintiff,<br><br>      vs<br><br>PENTIUS, LLC, a Delaware limited liability company; ARRAY US, INC., a Delaware corporation; SYSTEM ADMIN, LLC, a Florida limited liability company; CALLANDOR, LLC, a Delaware limited liability company; CTH SKIN CORP., a Delaware corporation; HOTBILLS, LLC, a Delaware limited liability company; and DOES 1 through 10, inclusive,<br><br>              Defendants. | Case No.  8:21-cv-01968-(JVS) (ADSx)<br>Honorable James V. Selna<br>Courtroom 10C<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEREOF**<br><br>[*Filed concurrently with Declarations of Proud Usahacharoenporn, David Coulter, Angela Pescatore, Jimena Cortes, and Rachelle Alexander; Notice of Lodging; and [Proposed] Order*]<br><br>**<u>Hearing</u>**<br>Date:            March 7, 2022<br>Time:            1:30 p.m.<br>Dept.:           10C<br><br><br>Date Action Filed:  December 1, 2021<br>Trial Date:            Not Set |

/ / /

/ / /

/ / /

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on March 7, 2022 at 1:30 p.m. or as soon thereafter as the matter may be heard, in Courtroom 10C of the United States District Court for the Central District of California, located at 411 West 4th Street, Santa Ana, California, before the Honorable James V. Selna, Plaintiff ConsumerDirect, Inc. ("Plaintiff" or "ConsumerDirect") will and hereby does move for a Preliminary Injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Local Rule 65-1, requiring Defendants Pentius LLC, Array US, Inc., System Admin, LLC, Callandor, LLC, CTH Skin Corp., and Hotbills, LLC (collectively, "Defendants")[1] to:

> (1) cease and desist their use of the infringing domains smartcreditview.com, smartcreditcollege.com, theidlock.com, creditmonitoringsolutions.com, propercreditmonitoring.com, credithivemonitor.com, honestcreditmonitoring.com, and creditmonitormaster.com (the "Cybersquatting Domains"), or any derivatives thereof;

> (2) cease and desist the provision of any and all services that Defendants are providing to the Cybersquatting Domains, or any derivatives thereof; and

> (2) cease and desist from marketing, advertising, displaying, or otherwise using the infringing marks smartcreditview, smartcreditcollege, theIDlock (the "Infringing Marks"), or any derivative thereof, or any mark that infringes on Plaintiff's trademarks, in connection with the sale, advertising, marketing and promotion of their financial self-help goods and services.

/ / /

/ / /

/ / /

---

[1] This includes Defendants' officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with Defendants.

1      This Application is made on the grounds that immediate and irreparable injury
2  will result to Plaintiff unless the activities described above are restrained pending trial.
3  The Application will be based on this Application, the accompanying Memorandum
4  of Points and Authorities, Notice of Lodging, and the declarations of Proud
5  Usahacharoenporn, David Coulter, Angela Pescatore, Jimena Cortes, and Rachelle
6  Alexander, and such other and further evidence as may be presented to the Court at
7  the time of hearing.

8

9  Dated:  January 31, 2022                    Respectfully submitted

10                                             RUTAN & TUCKER, LLP

11

12                                             By:   */s/ Proud Usahacharoenporn*
                                                    Proud Usahacharoenporn
13                                                  Attorneys for Plaintiff
                                                    CONSUMERDIRECT, INC.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................1

II.   FACTS ................................................................................................2

      A.   Background ...............................................................................2

      B.   Defendants Create Copycats of Plaintiff's Domains and
           Infringe on Plaintiff's Marks on Confusingly Similar
           Websites .................................................................................3

III.  THE COURT SHOULD GRANT A PRELIMINARY
      INJUNCTION ....................................................................................6

      A.   ConsumerDirect Is Likely To Succeed On The Merits .......................6

           1.   ConsumerDirect Is Likely To Succeed On Its First
                Claim for Federal Trademark Infringement Claim ...................7

           2.   ConsumerDirect Is Likely To Succeed On Its Third
                Claim For False Designation of Origin and Unfair
                Competition Claim....................................................................10

           3.   ConsumerDirect Is Likely To Succeed On Its
                Second Claim for Anti-Cybersquatting Consumer
                Protection Act Claim ...............................................................12

      B.   ConsumerDirect Has Suffered, And Will Continue To
           Suffer, Irreparable Harm Unless Provisional Relief Is
           Granted ...................................................................................13

      C.   The Balance Of Hardships Tips Sharply In
           ConsumerDirect's Favor ..........................................................14

      D.   An Injunction Is In The Public Interest ....................................15

IV.   CONCLUSION .................................................................................15

1

## <u>TABLE OF AUTHORITIES</u>

2

<u>Page(s)</u>

3

**Cases**

4

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
5
    722 F.3d 1229 (10th Cir. 2013) .................................................................... 10

6

*Brookfield Communs., Inc. v. W. Coast Entm't Corp.*,
7
    174 F.3d 1036 (9th Cir. 1999) ...................................................................... 11

8

*Cadence Design Sys. v. Avant! Corp.*,
9
    125 F.3d 824 (9th Cir. 1997) ........................................................................ 14

10

*Dr. Seuss Enters., L.P. v. Penguin Book USA, Inc.*,
    924 F.Supp. 1559 (S.D. Cal. 1996) *aff'd*, 109 F.3d 1394 (9th Cir.
11
    1997) ............................................................................................................. 14

12

*DSPT Int'l, Inc. v. Nahum*,
13
    624 F.3d 1213 (9th Cir. 2010) ...................................................................... 12

14

*eBay, Inc. v. Bidder's Edge, Inc.*,
15
    100 F.Supp.2d 1058 (N.D. Cal. 2000) ......................................................... 13

16

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*,
17
    198 F.3d 1143 (9th Cir. 1999) ...................................................................... 11

18

*Info Up, LLC v. Success for Life, Inc.*,
    No. 20-86-42-MWF, 2020 WL 7414746 (C.D. Cal. Nov. 20, 2020.) ............... 10
19

*Lahoti v. Vericheck, Inc.*,
20
    636 F.3d 501 (9th Cir. 2011) ........................................................................ 10

21

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
22
    658 F.3d 936 (9th Cir. 2011) ........................................................................ 10

23

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
24
    571 F.3d 873 (9th Cir. 2009) ........................................................................ 15

25

*MySpace, Inc. v. Wallace*,
26
    498 F.Supp.2d 1293 (C.D. Cal. 2007) .......................................................... 13

27

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
28
    638 F.3d 1137 (9th Cir. 2011) ................................................................. 6, 7, 8

**Page(s)**

**Cases (Cont.)**

*Official Airline Guides, Inc. v. Goss*,
    6 F.3d 1385 (9th Cir. 1993) ................................................................................. 9

*Rosetta Stone Ltd. v. Google, Inc.*
    676 F.3d 144 (4th Cir. 2012) ............................................................................. 10

*Samick Music Corp. v. Gordon*,
    No. SACV 20-395-GW-JDEx, 2020 WL 3210613 (C.D. Cal. Mar.
    26, 2020) ....................................................................................................... 7, 15

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) ............................................................................ 14

*United Artists Corp. v. United Artist Studios LLC*,
    No. CV 19-828-MWF, 2019 WL 3293650 (C.D. Cal. June 3, 2019) ................. 8

**Statutes**

15 U.S.C. § 1114 .......................................................................................................... 7

15 U.S.C. § 1116(a) ................................................................................................... 13

15 U.S.C. § 1125(a) ............................................................................................. 10, 13

15 U.S.C. § 1125(c) ................................................................................................... 13

15 U.S.C. § 1125(d) ............................................................................................. 12, 13

15 U.S.C. § 1125(d)(B)(i) .......................................................................................... 13

15 U.S.C. § 1125(d)(B)(i)(I) ...................................................................................... 13

15 U.S.C. § 1125(d)(B)(i)(II) ..................................................................................... 13

15 U.S.C. § 1125(d)(B)(i)(III) .................................................................................... 13

15 U.S.C. § 1125(d)(B)(i)(VII) ................................................................................... 13

Anti-Cybersquatting Consumer Protection Act ......................................................... 12

Trademark Modernization Act of 2020 ...................................................................... 13

Rutan & Tucker, LLP
*attorneys at law*

2530/102119-0036
17276881.1 a01/31/22
-iii-
MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

By way of this Motion, Plaintiff ConsumerDirect, Inc. ("Plaintiff" or "ConsumerDirect") seeks a Temporary Restraining Order ("TRO") requiring Defendants Pentius LLC ("Pentius"), Array US, Inc. ("Array"), System Admin, LLC, Callandor, LLC, CTH Skin Corp., and Hotbills, LLC (collectively, "Defendants")[2] to cease and desist their use of domains and marks that infringe on Plaintiff's protected marks.

Plaintiff is an industry leader in consumer self-help financial services that provides its services through websites such as smartcredit.com (since about 2009), idlock.com (since about 2015), and creditmonitoring.com (since about 2015), and has protected rights in those domains and associated marks.  Defendants Pentius and Array are competitors that provide similar services through other websites.  Rather than competing fairly, Pentius and Array have set up a series of shell companies, including the other Defendants, to register and operate websites at domain names confusingly similar to Plaintiff's domains, using marks that infringe on Plaintiff's marks in a deliberate attempt to create customer confusion and capitalize on Plaintiff's goodwill.

Specifically, Plaintiff has discovered that Defendants registered and are using, among others, the infringing domains smartcreditview.com, smartcreditcollege.com, theidlock.com, creditmonitoringsolutions.com, propercreditmonitoring.com, credithivemonitor.com, honestcreditmonitoring.com, and creditmonitormaster.com (the "Cybersquatting Domains").  Further, Defendants are using the infringing marks smartcreditview, smartcreditcollege, and theIDlock (the "Infringing Marks") within those domains.  Defendants' use of these Cybersquatting Domains and Infringing Marks has already led to persistent consumer confusion.  Almost daily,

---

[2]   This includes Defendants' officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with Defendants.

consumers contact Plaintiff to complain about Defendants' websites, with the belief that Plaintiff is affiliated with Defendant's copycat websites.  Such confusion has caused, and is continuing to cause, irreparable harm to the goodwill and reputation that Plaintiff has invested significant time and money in building over the past decade.

A preliminary injunction is necessary to prevent any further irreparable harm to Plaintiff.  As set forth below, all of the elements of a preliminary injunction are met.  Therefore, the Motion should be granted in its entirety.

## II.  FACTS

### A.  Background: Plaintiff is an Industry Leader in Financial Self-Help Services With Over 4 Million Consumer Members for Its Websites

Plaintiff is an industry leader in consumer self-help financial services, including credit management, credit reporting services, credit counseling, and credit monitoring since at least 2009.  (Coulter Decl., ¶ 2.)  Plaintiff provides these services through numerous of its own websites such as smartcredit.com (since about 2009), idlock.com (since about 2015), and creditmonitoring.com (since about 2015).  (*Id*., Exs. 2-4.)  Plaintiff also partners with other financial services companies and creates white labels and co-brands for them, which allows Plaintiff's partners to display and utilize Plaintiff's financial services on the partners' websites.  (*Id*.)

Plaintiff has continuously and prominently used the Marks: (1) "SMARTCREDIT" and "SMARTCREDIT.COM" (the "SMARTCREDIT Marks"); (2) "IDLOCK" and "IDLOCK.COM" (the "IDLOCK.COM Marks"); and (3) "CREDITMONITORING.COM" (the "CREDITMONITORING Mark") to denote the source of its high-quality products and services.  (*Id.*, ¶ 3.)[3]  Plaintiff owns several federal trademark registrations on the United States Patent and Trademark Office's ("USPTO") Principal Register, including for the Mark "SMARTCREDIT"

---

[3]   The SMARTCREDIT Marks, the IDLOCK.COM Marks, and the CREDITMONITORING Mark are hereinafter collectively referred to as the "Marks."

for goods and services in Classes 35, 36, and 42, Registration No. 6,068,903 dated June 2, 2020 and the Mark "SMARTCREDIT.COM" for goods and services in Classes 35, 36, and 45, Registration No. 3,819,295 dated July 13, 2010.  (*Id.*, ¶ 4, Exs. 5 & 6.)

Plaintiff has committed significant amounts of time, effort, and money (i.e., over $24 million a year annually in marketing expenses) to developing a widely respected reputation through which the Marks have acquired secondary meaning indicating Plaintiff as the source of its high-quality goods and services.  (*Id.*, ¶ 5.) Thus, before the acts complained of in this Complaint, members of the general consumer population, including Plaintiff's 7,000 business partners and over 4 million members of Plaintiff's websites, recognized the Marks as exclusive source identifiers for goods and services relating to consumer self-help financial services as originating from, sponsored, or approved by Plaintiff.  (*Id.*, ¶ 5.)

**B.**     **Defendants Create Copycats of Plaintiff's Domains and Infringe on Plaintiff's Marks on Confusingly Similar Websites**

Defendants are competitors of Plaintiff who also provide consumer self-help financial services and creates white labels and co-brands for other companies to allow them to display and utilize Defendants' financial services on their websites. (*Id.*, ¶ 6.)  After Plaintiff's adoption and use of the Marks, Defendants created financial services websites using domains and marks confusingly similar to Plaintiff's Marks for the specific purpose of unfairly competing with Plaintiff.

Within about the last year, Plaintiff discovered that Defendants created and operate the following Cybersquatting Domains:  (1) smartcreditview.com and smartcreditcollege.com, which are copycats of Plaintiff's website smartcredit.com; (2) theidlock.com, which is a copycat of Plaintiff's website idlock.com; and (3) creditmonitoringsolutions.com, propercreditmonitoring.com, credithivemonitor.com, honestcreditmonitoring.com, and creditmonitormaster.com, which are copycats of Plaintiff's website creditmonitoring.com.  (*Id.*, ¶ 7; Usaha

Decl., Exs. 23-31, 46-53.)  Within the copycat websites, Defendants use the Infringing Marks "smartcreditview" on smartcreditview.com, "smartcreditcollege" on smartcreditcollege.com and "theidlock" on theidlock.com, which infringe on Plaintiff's SMARTCREDIT Marks and IDLOCK.COM Marks.  (*Compare* Usaha Decl., Ex. 26-31, 66-67 to Coulter Decl., Exs. 2-4.)

Defendants' Cybersquatting Domains and Infringing Marks have already led to consumer confusion.  Plaintiff receives almost daily phone calls and emails from consumers totaling in the hundreds complaining and demanding refunds and the closing of their accounts, only to discover on further inquiry that these consumers signed up for membership with one of Defendants' Cybersquatting Domains, not one of Plaintiff's websites.  (Alexander Decl., ¶¶ 2-6, Exs. 61-65, 68.)  Given the amount of complaints about Defendants' websites that Plaintiff has received, any perceived association by consumers or the industry between Defendants' websites and Plaintiff causes direct harm to Plaintiff.

Further, Defendants created and operate, or have operated, copycat websites of others in the industry in addition to the Cybersquatting Domains, including: (1) wisecreditkarma.com, a copycat of Credit Karma's creditkarma.com; (2) myficofuture.com, a copycat of Fico's myfico.com; (3) mycreditbliss.com, a copycat of Credit Bliss' creditbliss.com; (4) myfreecreditscoresnow.com, a copycat of MyFreeScoreNow, Inc.'s myfreescorenow.com; (5) creditlifelock.com, a copycat of Norton's lifelock.com; and (6) truecreditview.com, a copycat of TransUnion's truecredit.com.  (*Compare* Usaha Decl., Exs. 34-45; Coulter Decl., ¶ 9, Exs. 7-12.)

Pentius and Array have set up a network of shell companies (including the other Defendants) to operate these copycat websites in an attempt to hide their involvement, and then attempted to further hide the existence of the shell companies by recently removing all mention of these shell companies from the websites. (Usaha Decl., Exs. 23-24, 26-27, 29-30.)  For example, the footer on creditmonitoringsolutions.com used to state that a shell company, "Callandor, LLC"

was the "proud owner of this website," but it has now been changed to state that "creditmonitoringsolutions.com is the proud owner of this website" in an attempt to conceal the website's connection to the shell company. (*Id.*, Exs. 23-24.) Likewise, theidlock.com used to state that it was owned by "Hotbills LLC" but now states that it is owned by "TheIDlock.com," and smartcreditview.com used to state that it was owned by "CTH Skin Corp." but now states that it is owned by "smartcreditview.com." (*Id.*, Exs. 26-27, 29-30.)

As evidence that the companies identified (and later concealed) as the owners of the copycat websites are shell companies, they identify addresses that are not legitimate business addresses; i.e., truecreditview.com provides 5262 Carlsbad Blvd., Carlsbad, CA 92008 as an address, which is a residence; wisecreditkarma.com provides 27 Paseo Viento, Rancho Santa Margarita, CA 92688 as an address, which is a residence; creditmonitoringsolutions.com provides 343 E. 30th St., Apt. 6E, New York, NY 10016 as an address, which is a residence; myficofuture.com provides 3653 Flake Mills Road, Decatur, GA 30034 as an address, which is a Papa John's Pizza. (*Id.*, ¶¶ 35-39, Exs. 54-58.) Very little other information other than these false addresses can be found about any of the shell companies.

Despite Pentius and Array's attempt to hide their involvement, the evidence demonstrates that they are behind each of these copycat websites because they all share ASN and IP addresses tracing back to a company called System Admin, LLC, which is yet another shell company because, according to the Federal Communications Commission, it is "no longer providing telecommunications services" as of 2019. (Pescatore Decl., ¶¶ 2-5, Exs. 13-17; Usaha Decl., Exs. 18, 19, 22.) Despite reporting to the federal government that it no longer provides telecommunications services, over 400 active financial self-help websites are currently registered to System Admin. (*Ibid.*)

The evidence demonstrates that those websites are being controlled by

Pentius and Array, and their related shell companies.  System Admin is reportedly owned by Michael LaSala, who is a Director of Pentius and files Pentius' annual reports.  (Pescatore Decl., ¶¶ 6-7, Exs. 20 & 21.)  Martin Toha is the top executive of System Admin, Array, and Pentius.  (Usaha Decl., Exs. 22, 32, 33.)  Array, which is a "spin-off" of Pentius, has admitted to providing the Application Programming Interface, or API, for the websites that are copycats of Plaintiff's websites.  (Cortes Decl., Ex. 1; Usaha Decl., ¶ 43.)[4]  Pentius, Array, and the copycat websites all share identical privacy policies.  (Usaha Decl., Exs. 25, 28, 31, 35, 37, 40, 43, 45, 47, 49, 51, 53, 59, 60, 67.)  There are other substantial similarities between all of the websites, including nearly identical footers, "contact us" pages, and member services, and the use of false business addresses.  (*Id.*, Exs. 23-31, 34-58, 66-67.)

Plaintiff sent a cease and desist letter to Defendants on November 15, 2021, but Defendants refused to cease and desist their wrongful conduct.  (*Id.*, ¶ 42.)

## III.   THE COURT SHOULD GRANT A PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).  For reasons set forth below, Plaintiff has satisfied each of the required elements.  Therefore, the Court should grant the requested relief.

### A.   ConsumerDirect Is Likely To Succeed On The Merits

ConsumerDirect has established a likelihood of succeeding on the merits of its First Through Third Claims.

---

[4]   During this telephone call that occurred on December 15, 2021, Pentius and Array claimed that they did not actually own the websites, but have since been unable to provide any proof of who actually does own the websites, despite Plaintiff's request.  (Usaha Decl., ¶ 43.)

1. **ConsumerDirect Is Likely To Succeed On Its First Claim for Federal Trademark Infringement Claim**

Plaintiff alleges with respect to its First claim for Federal Trademark Infringement under 15 U.S.C. § 1114 that Defendants infringed on Plaintiff's federally-registered trademarks for "SMARTCREDIT" and "SMARTCREDIT.COM" by using confusingly similar marks such as "smartcreditview," "smartcreditcollege," "smartcreditview.com," and "smartcreditcollege.com." "To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party 'must prove: (1) that it has a protectible ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion.'" *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011), citing *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.,* 448 F.3d 1118, 1124 (9th Cir.2006).

Here, Plaintiff easily meets the first element because Plaintiff has federally-registered trademarks for "SMARTCREDIT" (Registration No. 6068903) and "SMARTCREDIT.COM" (Registration No. 3819295). "Federal registration of a trademark constitutes prima facie evidence of the validity of the registered mark." *See Samick Music Corp. v. Gordon,* No. SACV 20-395-GW-JDEx, 2020 WL 3210613 *4 (C.D. Cal. Mar. 26, 2020), citing *Brookfield Communs., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

Plaintiff also meets the second element, likelihood of confusion. "The test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Samick, supra,* at *4. The following eight factors are considered in determining whether consumers are likely to be confused: "[1] strength of the mark; [2] proximity of the goods; [3] similarity of the marks; [4] evidence of actual confusion; [5] marketing channels used; [6] type of goods and the degree of care likely to be exercised by the purchaser; [7] defendant's intent in selecting the mark;

1   and [8] likelihood of expansion of the product lines." *Network Automation, supra,*

2   at 1145.  All of these factors demonstrate a likelihood of confusion as follows:

3       1. **Strength of the Mark**.  "The strength of a mark is evaluated along a

4          spectrum of distinctiveness. . . . The more distinctive a mark, the more

5          protection it will be afforded. Courts have generally described four

6          categories on the spectrum, in increasing level of protection: (1)

7          generic, (2) descriptive, (3) suggestive, and (4) arbitrary or

8          fanciful.  *United Artists Corp. v. United Artist Studios LLC*, No. CV

9          19-828-MWF (MAAX), 2019 WL 3293650, at *10 (C.D. Cal. June 3,

10          2019).  Here, "SMARTCREDIT" and "SMARTCREDIT.COM" are

11          suggestive (i.e., a mark that "subtly connote[s] something about the

12          products"), and is therefore a conceptually strong mark.  *See id.*

13          Moreover, the SMARTCREDIT Marks are commercially strong, as

14          demonstrated by the millions that Plaintiff spends advertising these

15          Marks annually and the millions in sales that Plaintiff has conducted

16          through these Marks.  (Coulter Decl., ¶ 5.)

17       2. **Proximity of the Goods.**  Both Plaintiff and Defendants are selling

18          financial self-help goods and services.  (*Id.*, ¶¶ 2, 6.)

19       3. **Similarity of the Marks.**  Defendants' Infringing Marks are

20          substantially similar to Plaintiff's Marks, as they use Plaintiff's Marks

21          "SMARTCREDIT" and "SMARTCREDIT.COM" in their Infringing

22          Marks smartcreditview and smartcreditcollege.  (*Id.*, Ex. 2; Usaha

23          Decl., Exs. 26-28, 66-67.)  Plaintiff's "SMARTCREDIT" Mark uses

24          the word "smartcredit" in all lowercase letters in blue font prominently

25          displayed on the upper left hand corner of the webpage.  (Coulter Decl.,

26          Ex. 2.)  Defendants' infringing "smartcreditview" mark also uses all

27          lowercase letters in an almost identical blue font.  (Usaha Decl.,

28          Ex. 26.)  Defendants' "smartcreditcollege" mark also uses all blue font

1    prominently displayed on the upper left hand corner of the webpage.

2    (Usaha Decl., Ex. 66.)

3    **4.  Evidence of Actual Confusion.**  Plaintiff has received numerous

4    phone calls and emails from consumers complaining and demanding

5    refunds and the closing of their accounts, only to discover on further

6    inquiry that these consumers signed up for membership with one of

7    Defendants' Cybersquatting Domains and not one of Plaintiff's

8    websites.  (Alexander Decl., ¶ 5, Ex. 63, 68.)

9    **5.  Marketing Channels Used.**  Both Plaintiff and Defendants use the

10   Internet as their main marketing channel.  (Coulter Decl., ¶¶ 2, 6.)

11   **6.  Type of Goods and the Degree of Care.**  Both Plaintiff and

12   Defendants sell the same type of goods, i.e., financial self-help goods

13   and services.  (*Id.*, ¶¶ 2, 6.)  While consumers of these types of goods

14   and services would normally employ some degree of care, Defendants'

15   Infringing Marks are so similar to Plaintiff's Marks that even

16   consumers using self-care are likely to be confused.  (*Id.*, Ex. 2; Usaha

17   Decl., Exs. 26-28, 66-67.)

18   **7.  Defendant's Intent.**  Defendants intended to specifically capitalize on

19   Plaintiff's Marks, because, as described above, Defendants targeted

20   Plaintiff's customers by making numerous copycat websites of all three

21   of Plaintiff's main websites, took substantial measures to cover up their

22   involvement, and continued using the Infringing Marks even after

23   Plaintiff's cease and desist demands.  "When an alleged infringer

24   knowingly adopts a mark similar to another's, courts will generally

25   presume an intent to deceive the public." *Official Airline Guides,*

26   *Inc. v. Goss,* 6 F.3d 1385 (9th Cir. 1993).

27   **8.  Likelihood of Expansion.**  The parties may expand their products

28   within the field of financial self-help goods and services, but given that

their goods and services already directly compete, "evidence of product expansion is not required for a finding of likelihood of confusion." *Lahoti v. Vericheck, Inc.,* 636 F.3d 501, 509 (9th Cir. 2011).

Plaintiff anticipates that Defendants will claim that they do not actively operate the websites upon which the Infringing Marks are used (but have refused to disclose who actually does actively own and operate the websites, despite Plaintiff's request), and that they are merely providing the API, or platform, upon which their customers are operating the websites. Even if true, this does not absolve Defendants of liability for contributory infringement. *See, e.g., Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,* 658 F.3d 936, 943 (9th Cir. 2011) (holding that contributory infringement exists where a defendant provided services with knowledge that the users of their services were engaging in trademark infringement); *Rosetta Stone Ltd. v. Google, Inc.* 676 F.3d 144, 163-165 (4th Cir. 2012) (stating that contributory infringement liability can arise when a defendant is made aware of the infringement but ignores it); *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1252-1255 (10th Cir. 2013) (holding that defendant's awareness of infringement and failure to take reasonable action constituted sufficient evidence of contributory infringement).

For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on its First Claim for Federal Trademark Infringement.

**2.** **ConsumerDirect Is Likely To Succeed On Its Third Claim For False Designation of Origin and Unfair Competition Claim**

Plaintiff's Third Claim for False Designation of Origin and Unfair Competition under 15 U.S.C. § 1125(a) alleges infringement of its SMARTCREDIT Marks and IDLOCK.COM Marks. "To prevail on an unfair competition claim sounding in infringement, a plaintiff must establish:  (1) a valid and protectable mark or trade dress; and (2) a likelihood of confusion stemming from another's use of a similar mark or trade dress." *Info Up, LLC v. Success for Life, Inc.,* No. 20-86-

42-MWF (MRWx), 2020 WL 7414746, *3 (C.D. Cal. Nov. 20, 2020.)  "Whereas
section 32 provides protection only to registered marks, section 43(a) protects
against infringement of unregistered marks and trade dress . . . ."  *Brookfield
Communs., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.8 (9th Cir. 1999)
(internal citations omitted) (citing *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo
Winery*, 150 F.3d 1042, 1046 (9th Cir. 1998); *Two Pesos, Inc. v. Taco Cabana*, 505
U.S. 763, 768 (1992)).

Here, Plaintiff has already shown a likelihood of success as to these required
factors for infringement of its registered SMARTCREDIT Marks for reasons set
forth above.  (*See* III.A.1.)  As for its unregistered IDLOCK Marks, Plaintiff has
valid and protectable marks because they are arbitrary, or at least suggestive.
*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1146-7
(9th Cir. 1999) ("Case law recognizes 'four different categories of terms with
respect to trademark protection:  (1) generic, (2) descriptive, (3) suggestive, and
(4) arbitrary or fanciful.'")  Moreover, the IDLOCK Marks are commercially strong
and have acquired secondary meaning because they have become distinctive of
Plaintiff's goods and services, as demonstrated by the exclusivity of Plaintiff's use
since 2015, and the substantial amounts of advertising dollars spent and sales made.
(Coulter Decl., ¶ 5.)

With respect to the likelihood of confusion, the same eight factors discussed
above with respect to Defendants' infringement of Plaintiff's SMARTCREDIT
Marks equally apply to their infringement of Plaintiff's IDLOCK Marks.  In
particular, the marks are substantially similar because Defendants' theidlock.com
features a logo using a capital "ID" with a picture of a lock displayed prominently
on the top left corner of the website, much like Plaintiff's idlock.com that also
features a logo using a capital "ID" with a picture of a lock displayed prominently
on the top left corner of the website.  (Coulter Decl., Ex. 3, Usaha Decl., Ex. 29.)
Moreover, there have already been hundreds of instances of actual confusion, i.e.,

1   between June 1 and December 22, 2021, Plaintiff received nearly 200 inquiries from

2   customers of Defendants' theidlock.com thinking that it was associated with

3   Plaintiff's idlock.com.  (Alexander Decl., Exs. 61-62.)  Therefore, Plaintiff has also

4   demonstrated a likelihood of success on its Third Claim.

5                **3.**     **ConsumerDirect Is Likely To Succeed On Its Second Claim**

6                           **for Anti-Cybersquatting Consumer Protection Act Claim**

7       Plaintiff's Second Claim for Violation of the Anti-Cybersquatting Consumer

8   Protection Act (15 U.S.C. § 1125(d), the "ACPA") alleges that Defendants violated

9   Plaintiff's rights in smartcredit.com, idlock.com, and creditmonitoring.com by

10   creating and operating the Cybersquatting Domains.  "The ACPA 'establishes civil

11   liability for 'cyberpiracy' where a plaintiff proves that (1) the defendant registered,

12   trafficked in, or used a domain name; (2) the domain name is identical or

13   confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant

14   acted 'with bad faith intent to profit from that mark.'"  *DSPT Int'l, Inc. v. Nahum*,

15   624 F.3d 1213, 1218-19 (9th Cir. 2010) (quoting 15 U.S.C. § 1125(d)).

16       Here, as set forth above, Plaintiff has registered rights in its SMARTCREDIT

17   Marks and protected rights in its IDLOCK.COM Marks.  (Coulter Decl., Exs. 5 &

18   6.)  Likewise, Plaintiff's CREDITMONITORING Mark is protected, as

19   demonstrated by Plaintiff's exclusive use of the mark since 2015, the substantial

20   amounts of advertising dollars spent, and the substantial sales made.  (*Id.,* ¶ 5.)

21       Defendants, through various shell companies, registered and used the

22   infringing domain names smartcreditview.com, smartcreditcollege.com,

23   theidlock.com, creditmonitoringsolutions.com, propercreditmonitoring.com,

24   credithivemonitor.com, honestcreditmonitoring.com, and creditmonitormaster.com,

25   which are patently confusingly similar to Plaintiff's protected and distinctive Marks

26   and have already resulted in customer confusion.  (Alexander Decl., Exs. 61-65, 68.)

27   This establishes both that Defendants "registered, trafficked in, or used a domain

28   name" and that the domain names used are "confusingly similar to a protected mark

1  owned by the plaintiff."

2    As for bad faith intent, 15 U.S.C. § 1125(d)(B)(i) identifies non-exclusive

3  factors to consider, many of which are present here.  For example, Defendants do

4  not have any registered trademark rights to any of the domain names or associated

5  marks.  (*See* 15 U.S.C. § 1125(d)(B)(i)(I); Usaha Decl., ¶ 13.)  The domain names

6  do not consist of the legal names of Defendants or any of the shell companies that

7  were used to set them up.  15 U.S.C. § 1125(d)(B)(i)(II).  According to the websites,

8  they were all established after Plaintiff began using Plaintiff's domain names.

9  (15 U.S.C. § 1125(d)(B)(i)(III); Usaha Decl., Exs. 23-31, 46-53.)  Moreover,

10  Defendants set up shell companies and provided false contact information in

11  connection with the websites, and did this for numerous websites that capitalize on

12  others' distinctive websites.  15 U.S.C. § 1125(d)(B)(i)(VII).  The foregoing

13  evidence in support of each element of Plaintiff's Second Claim establishes that

14  Plaintiff has demonstrated a likelihood of success on this claim.

15    **B.** **<u>ConsumerDirect Has Suffered, And Will Continue To Suffer,</u>**

16     **<u>Irreparable Harm Unless Provisional Relief Is Granted</u>**

17    The Trademark Modernization Act of 2020 (15 U.S.C. § 1116(a)) creates a

18  rebuttable presumption of irreparable harm upon a finding of a federal trademark

19  infringement or a violation of 15 U.S.C. § 1125(a), (c), or (d).  Here, for reasons set

20  forth above, Plaintiff has demonstrated federal trademark infringement and

21  violations of 15 U.S.C. § 1125(a) and (d).  Therefore, Plaintiff is entitled to

22  rebuttable presumption of harm.

23    Moreover, the evidence demonstrates irreparable harm.  "Harm to business

24  goodwill and reputation is unquantifiable and considered irreparable."  *MySpace,*

25  *Inc. v. Wallace*, 498 F.Supp.2d 1293, 1305 (C.D. Cal. 2007); *eBay, Inc. v. Bidder's*

26  *Edge, Inc.*, 100 F.Supp.2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost

27  profits and lost customer goodwill is irreparable because it is neither easily

28  calculable, nor easily compensable …").  Evidence of threatened loss of prospective

1   customers also supports a finding of irreparable harm.  *Stuhlbarg Int'l Sales Co. v.*

2   *John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001).  Here, Defendants'

3   conduct, particularly its use of unlawful practices in connection with the copycat

4   websites and infringing marks, has caused and is continuing to cause damage to

5   Plaintiff's goodwill and reputation because, among other things, customers that

6   would have signed up for Plaintiff's websites ended up signing up for Defendants'

7   websites, had complaints with Defendants' websites, and are now unlikely to sign

8   up for Plaintiff's websites as a result.  (Coulter Decl., ¶¶ 7-8; Alexander Decl., ¶¶ 2-

9   6, Exs. 61-65.)

10  **C.**   **The Balance Of Hardships Tips Sharply In ConsumerDirect's**

11        **Favor**

12       With regard to the balance of hardships, "[a] defendant who knowingly

13  engages in infringing activity 'cannot complain of the harm that will befall it when

14  properly forced to desist from its infringing activities.'"  *Cadence Design Sys. v.*

15  *Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (internal quotations omitted); *see*

16  *also Dr. Seuss Enters., L.P. v. Penguin Book USA, Inc.*, 924 F.Supp. 1559, 1574

17  (S.D. Cal. 1996) *aff'd*, 109 F.3d 1394 (9th Cir. 1997) ("[W]here the only hardship

18  that the defendant will suffer is lost profits from an activity which has been shown

19  likely to be infringing, such an argument in defense merits little equitable

20  consideration.") (quoting *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843

21  F.2d 600, 612 (1st Cir.1988)).

22       Here, for the reasons set forth above, it is apparent that Defendants knowingly

23  engaged in the infringing conduct and therefore cannot complain of any harm that

24  will befall them such as the loss of profits.  As explained in the preceding section,

25  the harm to Plaintiff if an injunction is denied is great; on the other hand, any harm

26  to Defendants is slight given Defendants operate and can continue to operate other

27  financial self-help websites that do not infringe Plaintiffs' Marks even if they are

28  enjoined from continuing the operation of the websites at issue in this Motion.

To the extent that Defendants attempt to argue that the harm to them is substantial because the Motion seeks a mandatory rather than a prohibitory injunction, such an argument is a nonstarter.  A preliminary injunction that orders a defendant to cease its use of a infringing mark is one that maintains the status quo prior to defendant's use and is not a mandatory injunction.  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–879 (9th Cir. 2009) (A preliminary injunction that acts "to restrain [the alleged infringer] from further acts of possible infringement" is prohibitory and not a mandatory injunction.).

### D.   An Injunction Is In The Public Interest

Finally, Plaintiff must establish that public interest considerations support issuance of the injunction. "In trademark cases, this factor is often addressed in terms of the public's right 'not to be deceived or confused.'" *Samick, supra,* at *11. Where defendants "deliberately and falsely tarnish[] the brand recognition and goodwill" of the plaintiff and in doing so mislead the public, the public interest supports issuance of an injunction. *Id.*  Here, Defendants have deliberately capitalized on Plaintiff's protected marks and good will and have actually misled the public.  (Alexander Decl., Exs. 61-65, 68.)  Therefore, the public interest is served by the requested relief.

## IV.   CONCLUSION

For the foregoing reasons, the Motion should be granted in its entirety.

Dated:  January 31, 2022

Respectfully submitted

RUTAN & TUCKER, LLP

By:   */s/ Proud Usahacharoenporn*
Proud Usahacharoenporn
Attorneys for Plaintiff
CONSUMERDIRECT, INC.