1  RUTAN & TUCKER, LLP
   Proud Usahacharoenporn (State Bar No. 278204)
2  pusaha@rutan.com
   Briana Richmond (State Bar No. 301824)
3  brichmond@rutan.com
   18575 Jamboree Road, 9th Floor
4  Irvine, California 92612
   Telephone:   714-641-5100
5  Facsimile:   714-546-9035

6  Attorneys for Plaintiff/Counter-Defendant
   CONSUMERDIRECT, INC.

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11  CONSUMERDIRECT, INC., a Nevada          Case No.  8:21-cv-01968 (JVS) (ADSx)
    corporation,
12                                          Honorable James V. Selna
              Plaintiff,                    Courtroom 10C
13
14       vs.

15  PENTIUS, LLC, a Delaware limited        **CONSUMERDIRECT, INC.'S**
    liability company; ARRAY US, INC., a    **OPPOSITION TO ARRAY US, INC.'S**
16  Delaware corporation; SYSTEM            **MOTION FOR SUMMARY**
    ADMIN, LLC, a Florida limited liability **JUDGMENT**
    company; CTH SKIN CORP., a
17  Delaware corporation; PENTOPS, LLC,
    a Delaware limited liability company;   [*Filed concurrently with Response to
18  DAILY STOCKS, INC., a Delaware          Separate Statement, Evidentiary
    corporation; NECTRIS, LLC, a Utah       Objections to the Declaration of Tyler
19  limited liability company; CLARITY      Bexley, and Declarations of David
    PROGRESSION, LLC, a Florida limited     Coulter, Steve Reger, Proud
20  liability company; and DOES 1 through   Usahacharoenporn, Angela Pescatore,
    10, inclusive,                          and Rachelle Alexander*]
21
              Defendants.
22                                          Date:  July 17, 2023
    ARRAY US, INC., a Delaware              Time: 1:30 p.m.
23  corporation,                            Courtroom: 10C
24            Counterclaimant,
25       vs.
26  CONSUMERDIRECT, INC., a Nevada
    corporation, and DOES 1 through 10,     Complaint Filed:   December 1, 2021
27  inclusive,                              Trial Date:        October 2, 2023
28            Counter-Defendants.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................1

II.     SUMMARY OF FACTS ........................................................................4

     A.     Infringement Claims .................................................................5

     B.     Unfair Competition Claim ........................................................6

     C.     Interference Claim ...................................................................11

III.    THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER ARRAY IS LIABLE FOR DIRECT INFRINGEMENT .............................................................................12

IV.     THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER ARRAY IS LIABLE FOR CONTRIBUTORY INFRINGEMENT ...............................................14

V.      THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER ARRAY IS LIABLE FOR INTERFERENCE ...............................................................................16

VI.     THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER ARRAY ENGAGED IN UNFAIR COMPETITION ...............................................................................17

VII.    THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING CONSUMERDIRECT'S DAMAGES ...............................18

VIII.   CONCLUSION .................................................................................22

# TABLE OF AUTHORITIES

Page(s)

FEDERAL CASES

*CrossFit, Inc. v. Parise*,
No. 13-CV-01085-CAB-JMA, 2014 WL 12508598
(S.D. Cal. Mar. 26, 2014) ................................................................................ 1, 12

*Fraley v. Facebook, Inc.*,
830 F. Supp. 2d 785 (N.D. Cal. 2011) ................................................................ 17

*Halcomb v. Wash. Metro. Area Transit Auth.*,
526 F.Supp.2d 24, 28 (D.D.C. 2007) .................................................................. 21

*Harvey v. District of Columbia*,
949 F.Supp. 874 (D.D.C. 1996) .................................................................... 20, 21

*Iacangelo v. Georgetown Univ.*,
272 F.R.D. 233 (D.D.C. 2011) ........................................................................... 20

*IOW, LLC v. Breus*,
425 F. Supp. 3d 1175 (D. Ariz. 2019) ................................................................ 13

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
591 F. Supp. 2d 1098 (N.D. Cal. 2008) ........................................................ 14, 15

*Petroliam Nasional Berhad v. GoDaddy.com Inc.*,
737 F.3d 546 (9th Cir. 2013) ......................................................................... 13, 14

*Rosell v. Wells Fargo Bank, N.A.*,
No. 12-CV-06321-JD, 2014 WL 4063050 (N.D. Cal. Aug. 15, 2014) ............. 17

*Zamfir v. Casperlabs, LLC*,
528 F. Supp. 3d 1136 (S.D. Cal. 2021) .............................................................. 13

CALIFORNIA CASES

*Cel-Tech Comm'ns, Inc. v. L.A. Cell. Tel. Co.*,
20 Cal. 4th 163 (1999) ........................................................................................ 18

**Page(s)**

**FEDERAL STATUTES**

15 U.S.C.
section 1117(a) ................................................................22
section 1125(d)(1)(D) .......................................................13

**CALIFORNIA STATUTES**

Business & Professions Code
section 17200 ...................................................................18

**FEDERAL RULES**

Federal Rules of Civil Procedure
rule 26 ...........................................................2, 18, 20
rule 26(a) ..........................................................................20
rule 26(a)(2)(B) .................................................................18
rules 26(a)(2)(B)(i)-(iii) ....................................................19
rules 26(a)(2)(B)(iv)-(vi) ...........................................19, 20
rule 26(a)(2)(E) .................................................................21
rule 26(a)(3)(B) .................................................................21
rule 26(e)(1) ......................................................................21
rule 26(e)(2) ......................................................................21
rule 37(a)(3) ......................................................................20
rule 37(b)(2) ......................................................................20
rule 37(c)(1) ......................................................................21

**NON-PERIODICAL PUBLICATIONS**

https://ag.ny.gov/press-release/2015/ag-schneiderman-obtains-settlement-company-
tricked-consumers-signing-credit ....................................4

www.idclub.com .............................................................10

www.smartcreditcollege.com ............................................5

www.smartcreditview.com ...................1, 5, 6, 10, 12, 13, 14, 15

2530/102119-0036
19210265 2 a06/22/23

-iii-

Case No. 8:21-cv-01968 (JVS) (ADSx)
CONSUMERDIRECT'S OPPOSITION TO ARRAY'S
MOTION FOR SUMMARY JUDGMENT

## I.      **INTRODUCTION**

ConsumerDirect, Inc. ("ConsumerDirect") opposes the Motion for Summary Judgment filed by Array US Inc. ("Array").  The Motion lacks merit and should be denied because genuine issues of fact abound.

Array and ConsumerDirect have competing online credit reporting platforms that incorporate credit data from the three credit bureaus (TransUnion, Equifax, and Experian) into their products, which are used on a variety of websites. ConsumerDirect filed this case after learning that Array set up rival websites that infringe on ConsumerDirect's registered mark for "Smart Credit" and engaged in unfair competition enabling Array to interfere with ConsumerDirect's customers.

Array argues that it has no liability for the infringing websites because it does not own the domains.  However, ownership of the domain is not required; a party can be held liable for simply "using" the infringing mark, which Array undeniably did.  See *CrossFit, Inc. v. Parise*, No. 13-CV-01085-CAB-JMA, 2014 WL 12508598, at *1-2 (S.D. Cal. Mar. 26, 2014) ("To succeed on the merits of a claim of trademark infringement, the Lanham Act requires . . . that the defendants **used** a mark confusingly similar to the plaintiff's protected mark").  Array "used" the infringing domain www.smartcreditview.com by providing to the website: its technology platform via which its credit products were displayed and sold, maintenance services, credit data, integration services, white label services, merchant processing, chargeback mitigation, and more.  (Usaha Decl., Ex. 29.)  In Defendants' own words, Array was "responsible for [] that domain." (*Id.*, Ex. 31 [Ertel Depo., p. 79:9-12].)

Array argues that it has no liability for interference and unfair competition because it did not engage in any wrongful conduct or violate any industry standard. Array violated an established industry standard regarding 3-bureau report ("3B Report") pricing and engaged in fraud in the process.  Since three credit bureaus control the entire industry, they have the power to set industry standards—

1  such as their rule that ████████████████████████████████████

2  ████████████████████████████████████████████████████████████

3  ██████████████████████████████████ This is a "standard" and a

4  "general rule" ████████████████████████████████. (*Id.*, Ex. 32

5  [Greaux Depo., pp. 39:19-40:11, 44:11-25, 135:5-20; 135:21-24, 137:11-13]; Reger

6  Decl., ¶ 3; Coulter Decl., ¶ 7.)

   Array fraudulently circumvented this industry standard by misrepresenting to
the bureaus its purpose for purchasing the 1B Reports in order to get the lower, non-
premium pricing.  This enabled Array to sell 3B Reports at lower prices ████████
████████████████████████████████████████████████. (*Id.*, Ex. 11;
Ex. 32 [Greaux Depo., pp. 120:20-121:4]; Ex. 33 [Carroll Depo., p. 68:9-20].)
Array then used this unfair pricing—which no other rule-abiding company could
ever obtain—to steal ConsumerDirect's customers.  Array was ultimately cited and
fined by the bureaus for these violations, but not before the damage was already
done to ConsumerDirect.

   Lastly, Array contends that ConsumerDirect cannot prove damages because
its expert report did not comply with FRCP 26.  But the report complied with all
disclosure requirements.  (*Id.*, Ex. 34.)  Array never previously claimed that the
report was insufficient or sought further disclosures.  (*Id.*, ¶ 35.)  Indeed, the report
was so comprehensive that Array's expert responded with a **34-page** rebuttal report
(with another 30 plus pages in attachments and schedules) in which Array's expert
critiqued the damages opinions in detail.  (*Id.*, Ex. 35.)  For Array to now claim that
the entirety of the damages should be excluded for insufficient disclosures in light of
these facts is disingenuous.  Further, ConsumerDirect seeks injunctive relief, so the
claims should proceed even if there are no damages.

   In recognition of the weakness of its arguments, Array spends minimal time
on the substance of its Motion and instead concocts a narrative about
ConsumerDirect conducting an "extensive 'recon' campaign" into Array, allegedly

pressuring credit bureaus not to do business with Array, and spreading rumors about Array violating industry standards and contracts. This fanciful narrative should be disregarded because it has nothing to do with the Motion.[1] ConsumerDirect simply conducted due diligence of its competitor and there is nothing wrong about that. The alleged "rumors" were true statements given Array did in fact violate industry standards and contracts as explained herein and, in any event, were made in cease and desist letters that are protected by the litigation privilege. The narrative serves no purpose but to distract from Array's wrongful conduct.

Indeed, Array engaged in the same "recon" of ConsumerDirect and its brand "SmartCredit." (*See* Usaha Decl., Ex. 10 [Toha Depo., pp. 226:24-227:5 (Array's CEO admitting that he signs up for memberships on ConsumerDirect websites)[2]]; Exs. 3, 6, 7, 8, 9 [Array taking screenshots and videos of private content on ConsumerDirect's websites and seeking information about ConsumerDirect's pricing].) Array even conducted "recon" into ConsumerDirect's ***entire*** partnership base and made a list of all of ConsumerDirect's customers internally referred to as the "SmartCredit List" that Array's sales team specifically targeted. (*Id.*, Ex. 10 [Toha Depo., p. 224:1-15, 221:23-222:6] Ex. 18; Ex. 4; Ex. 2 ["We got a lot of SC [SmartCredit] customers to hunt this week"].) After collecting information on ConsumerDirect, Array management issued "a mandate to help put smartcredit . . . out of business" and Array employees made it a goal to "put smart credit out o biz." (*Id.*, Exs. 1 & 5.)

But Array ran into a major problem in achieving its goal—it could not beat ConsumerDirect's pricing in the market. (*Id.*, Ex. 10 [Toha Depo., pp. 229:4-11, 230:2-16]; Ex. 235, 236.) As such, Array set out to "drive down the [] data costs from the credit bureaus" so that it could, in turn, sell its credit products at a lower

---

[1]   Indeed, *none* of these alleged facts are included in Array's Statement of Uncontroverted Facts and thus have no bearing on the Motion. *See* concurrently-filed evidentiary objections.
[2]   Coulter Decl. ¶ 8.

1    price and this is what motivated Array to fraudulently circumvent the 3B Reports

2    pricing described herein.  (*Id.*, Ex. 30 [Quintal Depo., pp. 31:11-24, 36:18-37:1].)

3    Competitive pricing is within the bounds of fair competition, but when that pricing

4    is achieved through an unfair and unlawful manner, however, it becomes actionable.

5    Array crossed that line from fair into unfair competition and should be held

6    accountable for its actions.

7         Array's challenge of ConsumerDirect's claims is baseless.  Summary

8    judgment should be denied.

9    **II.    SUMMARY OF FACTS**

10        ConsumerDirect has provided consumer self-help financial services,

11   including credit management, reporting services, and monitoring since 2003.

12   (Coulter Decl., ¶ 2.)  ConsumerDirect provides these services through its own

13   websites and partners with other companies to create white labels[3] for them, which

14   allows partners to display and utilize ConsumerDirect's financial services platform

15   on their websites.  (*Id.*)  Among other things, ConsumerDirect's services allow its

16   consumer users to view credit data from the three credit bureaus (TransUnion,

17   Equifax, and Experian).  (*Id.*)

18        Array is a "spin-out" of Pentius, which evolved from a company called

19   Profinity that was the subject of a New York State Attorney General investigation

20   resulting in six-digit fines based on findings of deceptive marketing practices; all

21   three companies were founded and are majority-owned by Array's CEO Martin

22   Toha.[4]  (Usaha Decl., Ex. 10 [Toha Depo., p. 12:23-14:20, 18:3-18, 19:11-22:1,

23   90:14-17].)  Pentius owned rights to a credit platform, which it transferred to its

24   affiliate company, Array.  (*Id.* [Toha Depo., p. 22:20-23:22].)  Array sells white

25   label services to the same types of companies that are ConsumerDirect's partners.

26

27   ───────────────

[3]   A "white label" means a product or service that is produced by one company and
rebranded by another company for its own use. (Coulter Decl., ¶ 3.)

28   [4]   https://ag.ny.gov/press-release/2015/ag-schneiderman-obtains-settlement-
company-tricked-consumers-signing-credit.

1   (*Id.* [Toha Depo., p. 151:23-25].)

2       ConsumerDirect filed this action, alleging that Array and Pentius

3   (collectively, "Defendants") infringed on ConsumerDirect's trademarks, engaged in

4   unfair competition, and intentionally interfered with ConsumerDirect's contract and

5   prospective economic advantage with its customer IdentityClub.  (Dkt No. 93.)

6       **A.    <u>Infringement Claims</u>**

7       ConsumerDirect has continuously and prominently used the Marks

8   "SMARTCREDIT" and "SMARTCREDIT.COM" (the "SMARTCREDIT Marks")

9   since at least 2009 to denote the source of its high-quality products and services.

10  (Coulter Decl., ¶ 3.)  ConsumerDirect owns federal trademark registrations  for the

11  Mark "SMARTCREDIT" (Registration No. 6,068,903 dated June 2, 2020) and the

12  Mark "SMARTCREDIT.COM" (Registration No. 3,819,295 dated July 13, 2010).

13  (*Id*.)  ConsumerDirect has committed significant resources (i.e., over $24 million a

14  year annually in marketing expenses) to developing a reputation through which the

15  SMARTCREDIT Marks have acquired secondary meaning indicating

16  ConsumerDirect as the source.  (*Id*.)  Even Pentius admits to knowing about the

17  SMARTCREDIT Marks as early as 2010 (meaning its spin-out Array also knew of

18  it).  (Usaha Decl., Ex. 31 [Ertel Depo., p. 78:18-25].)  With knowledge of the

19  SMARTCREDIT Marks, Defendants launched websites with the names

20  www.smartcreditview.com and www.smartcreditcollege.com.  (Dkt No. 34-22, ¶¶ 7-

21  9, 44, Exs. 26-28, 66, 67.)

22      Throughout 2021, ConsumerDirect received regular phone calls and emails

23  from consumers complaining and demanding refunds, only to discover that these

24  consumers signed up for membership with www.smartcreditview.com, which is not

25  associated with ConsumerDirect.  (Alexander Decl., ¶¶ 3-4, Exs. 41 & 42.)  CTH

26  Skin Corp. ("CTH Skin"), which is a white label partner of Array, is the registered

27  owner of the domain.  (Usaha Decl., Ex. 10 [Toha Depo., p. 212:6-15].)  However,

28  Array provides the technology platform that runs the entire website and is

"responsible for [] that domain;" Pentius provides the credit data that is displayed on the website;[5] and System Admin, LLC (a Pentius subsidiary), owns the IP addresses and ISN used for the domain.  (*Id.*, Ex. 29; Ex. 31 [Ertel Depo., p. 79:9-12, 91:15-17]; Ex. 10 [Toha Depo., p. 212:5-17].)  Defendants represented to third parties that www.smartcreditview.com was a Pentius brand, not a third party-owned brand.  (*Id.*, Ex. 32 [Greaux Depo., p. 79:4-10]; Ex. 25 & 26.)

Although Array claims that www.smartcreditview.com was taken down prior to this lawsuit, the website was still live as of at least December 28, 2021 when ConsumerDirect sought a preliminary injunction and members of the website still received messages from "smartcreditview.com" as late as January 2023 (in violation of the preliminary injunction).  (Pescatore Decl., ¶ 2, Ex. 40; Dkt No. 34-22, Ex. 28.)  Given the amount of complaints about the www.smartcreditview.com website, any perceived association by consumers or the industry between the website and ConsumerDirect causes direct harm to ConsumerDirect's reputation.  ConsumerDirect seeks damages in the amount of ███ constituting Array's revenue from the www.smartcreditview.com website.  (Usaha Decl., Ex. 34.)

**B.**     **Unfair Competition Claim**

ConsumerDirect alleges that Defendants engaged in unfair competition by cheating the system on prices that they pay the bureaus for 3B Reports, which are credit reports that contain data from all three bureaus (TransUnion, Equifax, and Experian).  (Dkt No. 93, ¶¶ 52-53.)  The three credit bureaus have reciprocity agreements between them that require them to pay each other when using another's data within 3B Reports.  (Usaha Decl., Ex. 32 [Greaux Depo., p. 141:19-142:3]; Ex. 30 [Quintal Depo., 18:23-19:20].)  Therefore, as a uniform rule, the credit bureaus ████████████████████████████████ ████████████████████████████████████████████ ██████████████████.  (*Id.,* Ex. 32 [Greaux Depo., p. 14:15-15:2].)

_____

[5]     CTH Skin originally contracted to have Pentops provide the data.  (*Id.*, Ex. 29.)



. (*Id.,* Ex. 32 [Greaux Depo., p. 44:11-45:1].)

. (*Id.*, Ex. 10 [Toha Depo., 65:1-7, 77:14-78:5].)

.

(*Id.*, Ex. 21.)

. (*Id.*, Ex. 16.)

. (*Id.*, Ex. 27.)

. (*Id.*, Ex. 21, 27.)

—as a "standard" and a "general rule." (*Id.*, Ex. 32 [Greaux Depo., pp. 39:19-40:11, 44:11-25, 135:5-20; 135:21-24, 137:11-13]; Reger Decl., ¶ 3; Coulter Decl., ¶ 7.)

ConsumerDirect alleges that Defendants circumvented this industry standard by purchasing credit reports individually, at the lower prices, and then merging them into 3B Reports without telling the bureaus, so that they could sell them at lower than the minimum price set by the bureaus *and* at lower prices than their rule-abiding competitors. (Dkt No. 93, ¶¶ 52-53.) This enabled Defendants to unfairly compete by offering lower prices in violation of this industry-wide rule. Defendants used this very tactic to steal ConsumerDirect's partners such as IdentityClub. (*Id.*) Pentius and Array's former Chief Commercial Officer Paul Quintal put it best (Usaha Decl., Ex. 30 [Quintal Depo., p. 30:5-22]):

Q    Would you consider it to be fair
competition if one company in the industry were
allowed to purchase the 1-B's at the lower price and
merge them into 3-B's at the ███ cost that you
mentioned earlier; whereas, everyone else in the
industry is having to buy the 3-B reports from the
bureaus at the more like ███ cost?

\* \* \*

A.    Do I think it would be fair that – that
other companies that are working in that industry
are adhering to a contract and somebody else isn't?
I would say, no, that's not fair.

The fact that Defendants were unfairly paying the lower prices for merged

3B Reports is not legitimately disputed. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ (*Id.,* Ex. 22 & 23;

Ex. 10 [Toha Depo., p. 52:22-55:13, 57:9-13]; Dkt No. 210-3, ¶¶ 7-9.)

Defendants claimed that their violation was the result of an inadvertent

"error" ████████████████████████. (Usaha Decl., Ex. 24;

Ex. 31 [Ertel Depo., pp. 131:18-132:1, 156:18-157:8]; Ex. 10 [Toha Depo., pp.

54:22-55:13].)  However, when asked for the basis of this excuse, Array's person

most knowledgeable Martin Toha testified that he had none.   (*Id.¸* Ex. 13 [2nd Toha

Depo., p. 53:18-22].)  Even Mr. Quintal testified that "it would be hard to believe

that it was an accident" given Defendants' express goal was to "drive down the []

data costs from the credit bureaus." (*Id.,* Ex. 30 [Quintal Depo., pp. 31:11-24,

36:18-37:1].)

The time periods in which the violations were found also belie the notion that

1   this was an inadvertent accident. ███████████████████████████

2   ███████████████████████. (*Id.,* Ex. 17.) ████████████████████

3   ████████████████████████████. (*Id.,* Ex. 10 [Toha

4   Depo., p. 54:10-55:22].) ████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ██████████████████████████████████████████████ (*Id.,*

8   Ex. 22, 23 & 28; Ex. 32 [Greaux Depo., pp. 87:4-88:14, 92:9-93:4].) ████████

9   ████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████ (*Id.,* Ex. 23.)

11  Indeed, Mr. Quintal testified that the entire time he was employed by Defendants

12  (from 2010 through 2020), he does not think that they **ever** paid the higher price for

13  all the merging that they did.  (*Id.,* Ex. 30 [Quintal Depo., pp. 30:23-31:10].)

14          As further evidence that Defendants' unauthorized use of the lower pricing

15  was not a mistake, Defendants repeatedly lied to TransUnion in an attempt to avoid

16  getting caught. ████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████

19  ████████████████████████████████. (*Id.,* Ex. 32 [Greaux Depo., pp. 44:11-

20  45:8; 134:1-15].) ████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████ (*Id.,* Ex. 32 [Greaux Depo., pp. 41:21-42:10, 45:9-

24  17].) █████████

25  ███████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████. (*Id.,*



1    Ex. 32 [Greaux Depo., pp. 22:10-14, 23:4-8, 23:22-24:5]; Ex. 10 [Toha Depo.,

2    pp. 39:25-40:8].) ███████████████████████████████████████████████

3    ████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████. (*Id.,* Ex. 32 [Greaux

5    Depo., pp. 22:10-14, 23:4-8, 23:22-24:5].) ████████████████████████████

6    ██████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████████

8    ██████████████████████████████████████████████████. (*Id.,*

9    Ex. 32 [Greaux Depo., pp. 26:3-15, 27:2-11, 28:5-9].) ████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ██████████████████████ (*Id.,* Ex. 32 [Greaux Depo., p. 31:8-32:22, 96:9-97:1];

13   Exs. 12 & 24; Ex. 31 [Ertel Depo., p. 99:12-16]; Ex. 33 [Carroll Depo., p. 27:21-

14   23].)

15       ID Club was not the only relationship that Defendants lied about. ████

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████. (*Id.*, Ex. 32 [Greaux

19   Depo., p. 79:4-10]; Ex. 25 & 26.) ████████████████████████████████

20   ████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████. (*Id.*, Ex. 32 [Greaux Depo.,

25   pp. 115:16-116:5].) ██████████████████████████████████████████████████

26   ███████████████████████████████████████████████████████████████████████.

27   (*Id.*, Ex. 31 [Ertel Depo., 100:25-101:2]; Ex. 10 [Toha Depo., pp. 40:18-24, 41:16-

28   22]; Ex. 32 [Greaux Depo., p. 25:2-6].) ███████████████████████████████████,

1  ██████████████████████████████████████████████

2  ████████████████████████████. (*Id.,* Ex. 28.)

3      **C.**    <u>**Interference Claim**</u>

4        ConsumerDirect alleges that Defendants used these unfair tactics to

5  intentionally interfere with ConsumerDirect's relationship with Kevin Carroll and

6  his companies.  Kevin Carroll owns Arius, which is the parent company of

7  IdentityClub aka Credco, Inc. fka ConsumerEdge, Inc. ("IdentityClub"), which has

8  been a partner of ConsumerDirect pursuant to a White Label Agreement since

9  June 18, 2019.  (Coulter Decl., Ex. 38.)

10        Unbeknownst to ConsumerDirect at the time, Defendants aggressively

11  pursued Mr. Carroll's business throughout 2020, with knowledge of

12  ConsumerDirect's agreement with IdentityClub.  (Usaha Decl., Ex. 33 [Carroll

13  Depo., p. 50:7-10].)  Mr. Carroll's told Defendants that if they can give him good

14  enough 3B Reports pricing, he would transfer the IdentityClub business from

15  ConsumerDirect to Array.  (*Id.*, Ex. 33 [Carroll Depo., p. 68:9-20]; Ex. 11 & 14.)

16  Ultimately, Array offered to sell him 3B Reports at ███████████████████

17  ████████████████████████████████████████████

18  ███████████████████████████. (*Id.,* Ex. 11.) ██████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████ (*Id.*, Ex. 32

21  [Greaux Depo., pp. 120:20-121:4]; Ex. 33 [Carroll Depo., p. 68:9-20].)

22        Array was only able to offer this pricing by lying to TransUnion that this was

23  a Pentius partner when it was an Array partner as explained above.  Further, neither

24  Pentius nor Array reported to the bureaus that 1B Reports were purchased for

25  Mr. Carroll's websites for the purpose of merged 3B Reports, which allowed them

26  to further escape the bureaus' scrutiny.  Array's invoices to Mr. Carroll's entity

27  show that ███████████████████████████████████████

28  █████████████████████████████████████████████

1  ███████████████████████████████████████████████████

2  ██████████ ).  (*Id.*, Ex. 15; Ex. 33 [Carroll Depo., p. 120:14-18].)

3      Array and Mr. Carroll knew that these prices were not bureau-sanctioned.

4  (*Id.*, Ex. 11.)  They conspired about what to tell TransUnion so they would not get

5  caught, stating to one another that ████████████████████████████████████

6  ███████████████████████████████████████████████████

7  ██████████ "  (*Id.*, Ex. 14.)

8      As a result of Defendants' efforts (particularly the 3B Reports pricing),

9  Mr. Carroll set up a new entity, DataOne LLC (of which Arius is the parent

10  company), to operate a new website called IDclub.com using Array's platform

11  (which was confusingly similar to IdentityClub.com that was run with

12  ConsumerDirect's platform).  (*Id.*, Ex. 33 [Carroll Depo., p. 27:24-28:4].)  Array

13  made it a requirement that Mr. Carroll send all IdentityClub website traffic from

14  ConsumerDirect to Array.  (*Id.*, Ex. 10 [Toha Depo., pp. 186:11-187:19]; Ex. 12.)

15  As a result, Mr. Carroll notified ConsumerDirect in January 2021 that he wished to

16  terminate the relationship and transferred website traffic to Array.  (Coulter Decl.,

17  Ex. 39.)  This resulted in ConsumerDirect's revenue from IdentityClub decreasing

18  significantly, causing ConsumerDirect approximately ███████████████ in lost

19  profits.  (Usaha Decl., Ex. 34.)

20  **III.   THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING**

21        **WHETHER ARRAY IS LIABLE FOR DIRECT INFRINGEMENT**

22      Array argues that it cannot be held directly liable for trademark infringement,

23  cybersquatting, or false designation because it did not register or own the domain

24  www.smartcreditview.com.  However, ConsumerDirect's claim does not turn on

25  whether Array registered or owned the domain; Array's use of the domain in

26  commerce is sufficient for liability.  Multiple cases make clear that registering or

27  owning a domain is only one basis for liability and using the domain in commerce is

28  an equally available basis for liability.  See *CrossFit, Inc. v. Parise*, No. 13-CV-

1  01085-CAB-JMA, 2014 WL 12508598, at *1-2 (S.D. Cal. Mar. 26, 2014) ("To

2  succeed on the merits of a claim of trademark infringement, the Lanham Act

3  requires . . . that the defendants **used** a mark confusingly similar to the plaintiff's

4  protected mark" and "[c]ivil liability for cybersquatting attaches when the 'plaintiff

5  proves that (1) the defendant registered, trafficked in, or **used** a domain name. . . .'"

6  [emp. added]); *Zamfir v. Casperlabs, LLC*, 528 F. Supp. 3d 1136, 1143 (S.D. Cal.

7  2021) ("To prevail on a claim of . . . false designation of origin, a plaintiff must

8  show that '(1) defendant **uses** a designation . . . in interstate commerce . . . in

9  connection with goods or services . . . ." [emp. added]).

10  "Use in commerce" includes placing the mark on "documents associated with

11  [] goods" that are "sold or transported in commerce" as well as using or displaying

12  the mark "in the sale or advertising of services" or "to describe [] product

13  offerings." *IOW, LLC v. Breus*, 425 F. Supp. 3d 1175, 1197 (D. Ariz. 2019);

14  *Zamfir, supra*, at 1144. Here, even if Array did not register or own the domain

15  www.smartcreditview.com, it is undisputed that Array **used** it. Array was a white

16  label partner with the domain's owner, CTH Skin Corp., and

17  www.smartcreditview.com displayed and sold Array's financial platform and

18  products. (Usaha Decl., Ex. 10 [Toha Depo., p. 212:5-17]; Ex. 29; Ex. 31 [Ertel

19  Depo., p. 79:9-12, 91:15-17].) Indeed, Defendants even represented to TransUnion

20  that www.smartcreditview.com was **their** brand, not a third-party owned brand.

21  (*Id.*, Ex. 32 [Greaux Depo., p. 79:4-10]; Ex. 25 & 26.)

22  Array cites to *Petroliam Nasional Berhad v. GoDaddy.com Inc.,* 737 F.3d 546

23  (9th Cir. 2013) for the proposition that the Anti-Cybersquatting Act provides a

24  "narrow definition of who 'uses' a domain name." The case supports

25  ConsumerDirect's claim. The statute provides that "[a] person shall be liable for

26  using a domain name . . . only if that person is the domain name registrant **or that**

27  **registrant's authorized licensee**." 15 U.S.C. § 1125(d)(1)(D) (emp. added). This

28  is designed to protect innocent registrars such as GoDaddy.com whose only role is

1  to register domain names without any more involvement.  *See Petroliam, supra,* at
2  550-51.

3       Here, Array is an authorized licensee per its contract with Baccus Enterprises,
4  LLC (the parent company of the domain owner CTH Skin Corp.).  (Usaha Decl.,
5  Ex. 29 (Exhibit B); Ex. 10 [Toha Depo., p. 212:24-213:10].)  Array did much more
6  than just register the domain name.  Array provided to the website: its technology
7  platform via which its credit products and services were displayed and sold,
8  maintenance services, credit data, integration services, white label services,
9  merchant processing, chargeback mitigation, and more.  (*Id.,* Ex. 29
10 [ARRAY_0011378].)  In Defendants' own words, Array was "responsible for [] that
11 domain."  (*Id.*, Ex. 31 [Ertel Depo., p. 79:9-12].)  Therefore, Array can and should
12 be held liable for direct infringement for its undisputed use of
13 www.smartcreditview.com.

14 **IV.   THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING**
15       **WHETHER ARRAY IS LIABLE FOR CONTRIBUTORY**
16       **INFRINGEMENT**

17      Array can and should also be held liable for contributory infringement.  When
18 a defendant is alleged to have provided services to the direct infringer, it can be
19 liable for contributory infringement if it exercised control over the means of
20 infringement and continued to provide services with knowledge of the infringement.
21 *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.,* 591 F. Supp. 2d 1098, 1111
22 (N.D. Cal. 2008).  As Array acknowledges, the "determination as to willfulness
23 requires an assessment of a party's state of mind, a factual issue that is not usually
24 susceptible to summary judgment."  (Dkt No. 222-1, p. 11:18-12:3, citing *N. Face*
25 *Apparel Corp. v. Dahan,* No. 13-04821 MMM (MANX), 2014 WL 12558010, at
26 *18 (C.D. Cal. Oct. 6, 2014).)  Nonetheless, Array seeks summary judgment on the
27 grounds that there is no evidence that Array had knowledge of the infringement and

28

1  did not continue to service the sites after gaining the knowledge.[6]  Array is wrong.

2      In terms of exercising control, Defendants admit that Array was "responsible

3  for [] that domain." (*Id.*, Ex. 31 [Ertel Depo., p. 79:9-12].)  Courts have held that

4  internet service providers that host IP addresses or provide other services to

5  infringing websites can exercise sufficient control to be held liable for contributory

6  trademark infringement.  *See Louis Vuitton, supra,* at 1111-1112.

7      Array relies on a declaration from Sean Horan, Vice President of CTH Skin

8  Corp., to demonstrate that the SmartCredit domain was chosen "without any

9  direction from Array." (Dkt. 222-1, 12:7-8.)  However, Mr. Horan's declaration

10  does not actually say this; instead, he vaguely says "[w]e came up with the name

11  'Smartcreditview'" without identifying who is being referred to as "we." (Dkt.

12  No. 223-37, ¶ 7.)  Indeed, Array's agreement with CTH Skin Corp. states that it will

13  provide "custom URLs . . . upon request." (Usaha Decl., Ex. 29.)  Even if Array did

14  not choose the domain, it knew that the domain was an infringement of

15  ConsumerDirect's mark.  Defendants knew of SmartCredit as early as 2010, well

16  before the infringing domain was used, and were actively targeting SmartCredit and

17  its customers with the intent to "put smart credit out o biz." (*Id.*¸ Ex. 5.)

18      Further, Array continued servicing the domain well after express notice of

19  infringement.  TransUnion notified Array that www.smartcreditview.com was an

20  infringement of TransUnion's trademark for Credit View in August 2021 and

21  ConsumerDirect notified Array that it was an infringement of ConsumerDirect's

22  SMARTCREDIT Marks in November 2021.  (*Id.*, Ex. 32 [Greaux Depo., p. 79:4-

23  10]; Ex. 25 & 26.)  Despite this notice, Array continued providing services to the

24  domain even as late as January 2023, well **after** the filing of this lawsuit and after

25  the Court issued a preliminary injunction that prohibits Array from doing so.

26  (Pescatore Decl., Ex. 40.)

27
28  ---
    [6]  Array argues that for the same reasons, ConsumerDirect cannot prove bad faith intent in support of its Anti-Cybersquatting claim.  For the same reasons stated herein, there are genuine issues of material fact relating to Array's bad faith intent.

## V.     THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING WHETHER ARRAY IS LIABLE FOR INTERFERENCE

Array next argues that ConsumerDirect's interference claims fail because there is no independently wrongful conduct since ConsumerDirect cannot prove that Array violated any industry standard.  To the contrary, there is ample evidence of violations of an established industry standard.  Specifically, ██████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████████████. (Usaha Decl., Ex. 32 [Greaux Depo., pp. 39:19-40:11, 44:11-25, 135:5-20; 135:21-24, 137:11-13]; Reger Decl., ¶ 3; Coulter Decl., ¶ 7.)  Notably, Array does not dispute that it violated these rules, nor can it legitimately do so since ███████████████ ████████████████████████████. (Usaha Decl., Ex. 22, 23 & 28.)

Array faults ConsumerDirect for not offering testimony from a retained expert, however, a retained expert is not necessary when TransUnion's Ken Greaux (with over 20 years' experience in the credit industry), ConsumerDirect's CEO David Coulter (with over 20 years' experience in the credit industry), ConsumerDirect's VP Steve Reger (with over 30 years' experience in the credit industry including 27 years with TransUnion), and Array's Martin Toha, all confirmed ████████████████████████████████████████████ █████████████████████████████████. (*Id.,* Ex. 32 [Greaux Depo., p. 44:11-45:1]; Ex. 10 [Toha Depo., 65:1-7, 77:14-78:5]; Reger Decl., ¶ 3; Coulter Decl., ¶ 7.)[7]  Contrary to Array's argument that these standards have "only been added recently because of CD's activity in this lawsuit," █████████████████████ ████████████████████████████████████████████████████████ ██. (*Id.,* Ex. 32 [Greaux Depo., pp. 44:11-45:8; 134:1-15].)

Thus, contrary to Array's argument, ConsumerDirect is not merely relying on

---

[7]    Array repeatedly cites to the deposition of Angela Pescatore on these issues and refers to her as the 30(b)(6) representative; notably, she was **not** designated as the corporate representative on any of these issues.  (Usaha Decl., Ex. 37.)

1   a breach of bureau contracts to establish its claims. ████████████████

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ██████████. (*Id.*, Ex. 32 [Greaux Depo., p. 44:11-45:1]; Ex. 10 [Toha Depo., 65:1-

5   7, 77:14-78:5]; Reger Decl., ¶ 3; Coulter Decl., ¶ 7; Ex. 16; Ex. 27.)  It is the

6   violation of this rule that forms the basis of ConsumerDirect's claims.

7          In addition to violating the industry standards, Array also engaged in

8   wrongful conduct by perpetrating fraud on TransUnion in order to pay the lower

9   prices.  As explained above, Array repeatedly falsely told TransUnion that its white

10  label partners were actually partners of Pentius ████████████████

11  ████████████████████████████████████████████████████

12  ████████████████████. (*See, e.g., id.*, Ex. 32 [Greaux Depo., p. 31:8-32:22,

13  96:9-97:1]; Exs. 12 & 24; Ex. 31 [Ertel Depo., p. 99:12-16]; Ex. 33 [Carroll Depo.,

14  p. 27:21-23].)  Thus, even if the Court finds that there is no industry standard,

15  summary judgment should still be denied because Array engaged in independently

16  wrongful fraudulent conduct.

17  **VI.   <u>THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING</u>**

18       **<u>WHETHER ARRAY ENGAGED IN UNFAIR COMPETITION</u>**

19          Array makes the same argument with regard to ConsumerDirect's unfair

20  competition claim, which arguments are meritless for the same reasons.

21  "California's UCL prohibits any 'unlawful, unfair, or fraudulent business act or

22  practice.'" *Rosell v. Wells Fargo Bank, N.A.*, No. 12-CV-06321-JD, 2014 WL

23  4063050, at *5 (N.D. Cal. Aug. 15, 2014), citing Bus. & Prof. Code § 17200.  "The

24  UCL is designed to ensure 'fair business competition' and governs both anti-

25  competitive business practices and consumer injuries. . . .  Its scope is 'sweeping,'

26  and its standard for wrongful business conduct is 'intentionally broad,' allowing

27  courts 'maximum discretion to prohibit new schemes to defraud.'" *Fraley v.*

28  *Facebook, Inc.*, 830 F. Supp. 2d 785, 810 (N.D. Cal. 2011).  "When a plaintiff who

claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Comm'ns, Inc. v. L.A. Cell. Tel. Co.*, 20 Cal. 4th 163, 186-87 (1999).

Here, as explained above, Array engaged in unfair and fraudulent conduct by violating the industry pricing standards (and lying about it) in order to intentionally undercut its competitors. Even Defendants' former Chief Commercial Officer Paul Quintal testified that this constitutes unfair competition. (Usaha Decl., Ex. 30 [Quintal Depo., p. 30:5-22].) This conduct was more than just a mere breach of the bureau contracts because it violated industry standards and constituted fraud. Therefore, Array's argument that the claim fails because it is based entirely on a breach of contract lacks merit.

## VII.   THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING CONSUMERDIRECT'S DAMAGES

Lastly, Array argues that ConsumerDirect cannot prove damages because its damages expert Victoria Wilkerson's report did not comply with FRCP 26. Per FRCP 26(a)(2)(B), an expert report must contain the following:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;

> (ii) the factor or data considered by the witness in forming them;

> (iii) any exhibits that will be used to summarize or support them;

> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

> (v) a list of all other cases in which, during the previous

4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

On March 27, 2023, ConsumerDirect served its initial disclosures, which contained Victoria Wilkerson's initial report containing all six of the required items. (Usaha Decl., Ex. 34.)  In satisfaction of FRCP 26(a)(2)(B)(i)-(iii), Ms. Wilkerson opined that ConsumerDirect's damages ranged from $███████████████ for "lost profits from the client Identity Club" and attached nearly 20 pages of schedules and charts containing the basis and reasoning behind that calculation.  (*Id.*)  She also opined that ConsumerDirect suffered ████████ in damages constituting "Array's revenue from the use of Smartcreditview.com," included a chart showing the monthly calculation totaling that number, and cited the document produced by Array from which the numbers were derived.  (*Id.*)  Per FRCP 26(a)(2)(B)(iv)-(vi), Ms. Wilkerson provided her qualifications, list of publications, list of other cases in which she testified, and her hourly rate.  (*Id.*)  In response, Array produced a **34-page** rebuttal report (with another 30 plus pages in attachments and schedules) in which Array's expert critiqued Ms. Wilkerson's damages opinions in detail.  (*Id.*, Ex. 35.)  Defendants did not seek to meet and confer to request any more detailed disclosures.  (*Id.*, ¶ 35.)

ConsumerDirect offered Ms. Wilkerson for a deposition for an entire day and she answered all of the questions posed of her.  (*Id.*, ¶ 36.)  Defendants chose not to question Ms. Wilkerson substantively about her initial opinions or her reactions to their rebuttal report, although ConsumerDirect did nothing to stop them from doing so.  (*Id.*)  Following the deposition, since Defendants did not elicit the information from her, ConsumerDirect produced a 10-page sur-rebuttal report containing her opinions in response to Array's rebuttal report that she would have testified to at her deposition had Array asked her.  (*Id.*, Ex. 36.)  She even offered to sit for another

Case No. 8:21-cv-01968 (JVS) (ADSx)
CONSUMERDIRECT'S OPPOSITION TO ARRAY'S
MOTION FOR SUMMARY JUDGMENT

1   deposition about these issues if any party requested it of her.  (*Id.*, ¶ 36.)  Again,

2   Defendants did not seek to meet and confer about further disclosures.  (*Id.*)

3   　　　　Despite never requesting a further disclosure, Defendants now argue that all

4   of Ms. Wilkerson's opinions should be excluded for an alleged failure to comply

5   with FRCP 26.  Array faults Ms. Wilkerson for not providing the facts supporting

6   her opinions or outlining her reasoning.  However, Ms. Wilkerson provided ample

7   facts, data, charts, and other information supporting her opinions.  (*Id.*, Ex. 34.)  As

8   evidence that the disclosure was sufficient, Array's expert provided a lengthy

9   analysis of Ms. Wilkerson's opinions on their merits, meaning there was more than

10  enough information in the report for him to understand and critique her opinions.

11  (*Id.*, Ex. 35.)  The purpose of Rule 26 is to provide fair disclosures to the other side

12  sufficient for them to be able to respond to them at trial and Ms. Wilkerson's report

13  complied with this standard.  Indeed, Array does not even articulate any specific

14  information it believes it was entitled to but did not receive.

15  　　　　If Array believed the disclosure was insufficient, it was incumbent on Array

16  to request more information or seek an order directing a further disclosure pursuant

17  to FRCP 37(a)(3) ("If a party fails to make a disclosure required by Rule 26(a), any

18  other party may move to compel disclosure").  The drastic sanction of striking an

19  expert's opinions would be appropriate only if a party violates a prior Court order

20  compelling disclosure.  *See* FRCP 37(b)(2).  Indeed, even "woefully inadequate"

21  expert reports are allowed where the receiving party fails to request further

22  disclosures and fails to take advantage of deposition opportunities as the assertion of

23  "significant prejudice" under those circumstances is "utterly disingenuous."  *Harvey*

24  *v. District of Columbia,* 949 F.Supp. 874, 877-878 (D.D.C. 1996).

25  　　　　Here, Array made no attempt to request further disclosures at any time (nor

26  did it need to given its expert fully understood Ms. Wilkerson's opinions).  (Usaha

27  Decl., ¶¶ 35-36.)  Array did not even bother to ask Ms. Wilkerson substantive

28  questions at deposition.  (*Id.*, ¶ 36; *see Iacangelo v. Georgetown Univ.*, 272 F.R.D.

233, 234 (D.D.C. 2011) ["In practice, [] a party is considered to have met its obligations for expert disclosure so long as all required information is divulged in either the written report or a subsequent deposition of the expert."], citing *See, e.g., Halcomb v. Wash. Metro. Area Transit Auth.,* 526 F.Supp.2d 24, 28 (D.D.C. 2007).) Array also did not take up Ms. Wilkerson's offer to be deposed again.  (Usaha Decl., ¶ 36.)  Array's attempt to now strike the entirety of Ms. Wilkerson's opinions based on prejudice from an alleged failure to disclose is therefore "utterly disingenuous." *See Harvey, supra,* at 877-878.

Even if the Court were to find Ms. Wilkerson's report to be insufficient and that Array is entitled to this drastic relief despite Array never seeking a further disclosure, any perceived failure to disclose was substantially justified and harmless. *See* FRCP 37(c)(1).  Namely, the disclosure was substantially justified because ConsumerDirect had a good faith basis for believing that the disclosures were sufficient since Ms. Wilkerson provided ample detail supporting her opinions and Array never notified ConsumerDirect otherwise.  (Usaha Decl., Ex. 34.)  Further, it was harmless because Array's expert had more than enough information to provide detailed and lengthy rebuttal opinions and ConsumerDirect even provided a sur-rebuttal report in an abundance of caution.  (*Id.*, Ex. 35.)

Array also challenges Ms. Wilkerson's sur-rebuttal report that was provided after her deposition.  However, the sur-rebuttal was appropriate because parties are under a duty to supplement their experts' reports or deposition testimony if they learn the testimony is incomplete.  *See* FRCP 26(a)(2)(E), (e)(2).  Such supplemental disclosures must be made "in a timely manner" no later than 30 days before trial.  FRCP 26(a)(3)(B), (e)(1) & (2).  ConsumerDirect believed its disclosure to be complete and did not realize until after the deposition that Array intended to argue the entire report should be stricken for allegedly incomplete disclosures and that it did not intend to ask Ms. Wilkerson anything that would elicit her testimony regarding Mr. Bell's rebuttal.  (Usaha Decl., ¶ 36.)  Within days,

1  ConsumerDirect produced the sur-rebuttal report containing Ms. Wilkerson's
2  responses to Mr. Bell's rebuttal—which would have been provided at deposition had
3  it been asked—in order to avoid any unfair surprise at trial.  (*Id.*, Ex. 36.)  This
4  report was disclosed over four months before trial and is therefore timely.

5          Regardless, even if the Court somehow finds that Ms. Wilkerson's opinions
6  should be stricken, summary judgment should still be denied on the trademark
7  claims because the Lanham Act allows for disgorgement of profits, which simply
8  involves adding up monthly revenue received by Array per documents Array
9  produced, which does not require expert testimony.  15 U.S.C. 1117(a).  Further,
10  ConsumerDirect seeks an injunction enjoining Defendants from infringing on
11  ConsumerDirect's marks and from engaging in deceptive 3B Reports merging
12  practices.  (Dkt No. 93, pp. 31-32.)  Therefore, there is no basis to enter summary
13  judgment on any of the claims based on exclusion of Ms. Wilkerson's opinions even
14  if warranted (which it is not).

15  **VIII.  <u>CONCLUSION</u>**
16          For the foregoing reasons, the Motion should be denied.  ConsumerDirect's
17  claims should proceed to
18  trial.  Dated: June 26, 2023                RUTAN & TUCKER, LLP
19
                                                By:    */s/ Proud Usahacharoenporn*
20                                                        Proud Usahacharoenporn
21                                                        Attorneys for CONSUMERDIRECT,
                                                        INC.
22
23
24
25
26
27
28

1

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for ConsumerDirect, Inc., certifies that this brief contains 6,994 words, which complies with the word limit of L.R. 11-6.1.

Dated: June 26, 2023                    RUTAN & TUCKER, LLP


                                   By:   /s/ Proud Usahacharoenporn
                                         Proud Usahacharoenporn
                                         Attorneys for CONSUMERDIRECT,
                                         INC.