UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| CONSUMERDIRECT, INC., | ) Case No. 8:21-cv-01968-JVS-ADS |
| Plaintiff, | ) |
| | ) FINDINGS OF FACT & |
| v. | ) CONCLUSIONS OF LAW |
| | ) |
| PENTIUS, LLC; ARRAY US, INC.; | ) |
| SYSTEM ADMIN, LLC; CTH | ) |
| SKIN CORP.; PENTOPS, LLC, | ) |
| Defendants | ) |

Plaintiff ConsumerDirect, Inc. ("ConsumerDirect"), alleges that Defendants Pentius, LLC ("Pentius") and Array US, Inc. ("Array") (collectively, "Defendants"), infringed on their trademark and competed unfairly by violating their agreements with the three credit bureaus.  Having carefully considered and

reviewed all the testimonial and documentary evidence presented by the parties in the matter, the Court now enters the following findings of fact and conclusions of law.  Fed. R. Civ. P. 52.

## I. Jurisdiction & Venue

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a)-(b), and pendent jurisdiction over the state law claims under 28 U.S.C. § 1367 because those claims are joined with substantially related claims under the Lanham Act.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs and is between citizens of different states.  Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and (3) because a substantial part of the events giving rise to the claims occurred in this District where ConsumerDirect maintains its principal place of business.  These claims are properly before this Court as equitable issues.

## II. Procedural Background

2. ConsumerDirect filed this lawsuit on December 1, 2021.  (Complaint, Dkt. No. 1.)  On May 9, 2022, Array filed a counterclaim against ConsumerDirect.  (Dkt. No. 127.)  Some claims were resolved by way of summary judgment.  (Dkts. Nos. 311 (sealed), 321, 323 (sealed), 354.)  Other claims were resolved via a jury trial. (Dkt. Nos. 501–504.)  The only remaining issues before the Court are ConsumerDirect's trademark infringement, false designation of origin, and unfair competition law claims against Pentius and Array.  (Dkt. Nos. 438, 519.)  In a seven-day jury trial, held on October 26, 2023, to November 8, 2023, the parties presented live testimony and exhibits.  The parties submitted proposed findings of fact and conclusions of law.  (Dkt. Nos. 520, 525 (sealed).).

## III. Findings of Fact

3. As a preliminary matter, the Court notes that the jury provided an advisory verdict relevant to ConsumerDirect's trademark infringement and false

designation of origin claims against Pentius and Array.  (Dkt. No. 501.)  When asked whether ConsumerDirect prevailed on its claim for trademark infringement against Array and Pentius, the jury answered "no."  (Id.)  When asked whether ConsumerDirect prevailed on its claim for false designation of origin against Array and Pentius, the jury answered "no."  (Id.)  And while the Court notes that this verdict is strictly advisory, the Court affords considerable weight to the independent perspective of the jury—both in terms of the jurors' evaluation of the evidence and their assessment of the witnesses' credibility.

4. The Court also addresses the credibility of two key witnesses: David Coulter ("Coulter"), ConsumerDirect's President and CEO, and Steve Reger ("Reger"), Executive Vice President of Sales & B2B Marketing of ConsumerDirect.  As explained in the Court's prior order, ConsumerDirect committed fraud on the court in the sworn declarations and depositions of Coulter and Reger.  (Dkt. No. 417.)  Where the Court has made factual determinations on disputed issues, it gives both witnesses' testimony substantially reduced weight.

## A. The Parties

5. ConsumerDirect is a Nevada company that provides consumer self-help financial services, including credit management, credit reporting services, credit counseling, and credit monitoring.  (Declaration of David Coulter ("Coulter Decl."), Dkt. No.262-3, ¶ 2.)  ConsumerDirect also partners with other financial services companies to create "white labels" for them, which allows these partners to display and utilize ConsumerDirect's financial services platform on their websites.  (Id.)

6. Pentius is a Delaware company that provides "direct-to-consumer" services.  (11/1 Tr. AM 132:12-16.)  Pentius provides credit and identity protection information and services to consumers though various brands it owns.  (Id.) Pentius was operating for several years before Martin Toha ("Toha"), Array's CEO and founder, later founded Array.  (Id. at 132:4-11.)

7. Array is a Delaware company that provides "business-to-business-to-consumer" services. (Id. at 22:21-23.) Array serves its clients' consumer credit monitoring businesses through websites to offer more user-friendly credit score services to consumers. (Id.; Deposition Transcript of Martin Toha ("Toha Depo. Tr."), Dkt. No. 225-9, at 23:3-9.) Array began as a division of Pentius in 2019 and 2020 to test the viability of its product. (11/1 Tr. AM 133:19-134:24.) An initial iteration of Array was named Credmo. (Id.) But because it began being marketed externally, the name was changed to Array. (Id.) Credmo/Array was a part of Pentius until the companies later separated. (Id.)

8. In the third quarter of 2020, Pentius and Array decided to separate and began the process of restructuring the companies, incorporating a new entity, dividing full-time employees between Pentius and Array, and performing other tasks required to separate the two entities. (11/1 Tr. PM 10:14-11:19.) The process took several months. (Id.)

### B. Trademark Infringement and False Advertising

9. ConsumerDirect offers a product called Smart Credit, which it offers directly to consumers and through co-branding or "white label" partnerships with other businesses. (10/31 Tr. AM 70:16-19, 71:10-72:3.) ConsumerDirect owns the trademarks SMARTCREDIT and SMARTCREDIT.COM. (Id. at 72:10-17; 10/31 Tr. PM 81:22-82:2; Final Pre-Trial Conference, Dkt. No. 438, at 3–4.)

10. The domain smartcreditview.com was registered and owned by CTH Skin Corp., a white label client of Array. (Final Pre-Trial Conference at 4; Trial Ex. 509.) CTH Skin Corp. is a separate entity from Array and Pentius. (11/1 Tr. PM 60:19-61:2, 63:12-15; 11/3 Tr. PM 17:4-13.) The smartcreditview.com website employed Array and Pentius' technology; however, neither Array nor Pentius owned, registered, selected, or used the domain smartcreditview.com. (11/1 Tr. AM 48:3-5; 11/1 Tr. PM 61:8-62:4.)

11.     Under Array's agreements with its white label clients, including CTH Skin Corp., the client is responsible for clearing any trademark or intellectual property concerns connected with a domain name. (Trial Ex. 360; 11/1 Tr. PM 64:13-65:24.) This is consistent with the responsibilities ConsumerDirect imposes on its own white label partners. (11/3 Tr. PM 54:9-55:12 (testifying that, in a separate lawsuit involving trademark infringement claims against ConsumerDirect, ConsumerDirect took the position that its white label client had control of its public pages and would have been responsible for any trademark infringement on those pages, not ConsumerDirect as the platform provider).)

12.     In August 2021, Ken Greaux at TransUnion notified Array and Pentius that he felt smartcreditview.com might infringe on TransUnion's trademark creditviewdashboard. (Trial Ex. 154.) Upon being notified of TransUnion's concerns, Array immediately stopped accepting new enrollments for smartcreditview.com. (11/1 Tr. PM 70:2-74:11.) CTH Skin Corp. briefly left up a log-in page for existing customers to access until those customers could be transferred to a new domain. (Id.; Trial Ex. 505.)

13.     ConsumerDirect's representative at trial testified that ConsumerDirect was not aware of a single customer who contacted ConsumerDirect to say they signed up for "smartcreditview.com" but actually intended to sign up for smartcredit.com. (10/31 Tr. PM 20:16-21:1, 21:15-23.) Nor was ConsumerDirect's representative aware of a single customer who contacted ConsumerDirect to say they were confused between Array or Pentius on one hand, and Smart Credit on the other hand. (Id.) Thus, the Court finds that no customers confused smartcreditview.com with ConsumerDirect's Smart Credit.

14.     Array received only a few hundred dollars in revenue from CTH Skin Corp.'s smartcreditview.com white label. (Trial Ex. 232; 11/3 Tr. AM 37:23-38:9.)

15.     There was no evidence at trial that Pentius received any

revenue—directly or indirectly—from CTH Skin Corp.'s smartcreditview.com white label.

16. Array and Pentius had no notice of ConsumerDirect's trademark infringement claim until ConsumerDirect sent its demand letter on November 15, 2021. (Trial Ex. 131; 11/1 Tr. PM 74:13-76:10; 11/3 Tr. AM 73:24-74:4.) Smartcreditview.com had already ceased accepting new enrollments by the time Array received the letter. (Trial Ex. 131; 11/1 Tr. PM 74:13-76:10; 11/3 Tr. AM 73:24-74:4.) Although Array scheduled a call with ConsumerDirect to discuss the claim, ConsumerDirect's lawyers canceled the call and filed this lawsuit on December 1, 2021, without ever conferring with Array or Pentius. (Trial Ex. 131; 11/1 Tr. PM 74:13-76:10; 11/3 Tr. AM 73:24-74:4.)

17. The Court finds that Array and Pentius did not use the domain smartcreditview.com. Any use of the smartcreditview.com domain was by third-party CTH Skin Corp.—not Array or Pentius.

### C. Merged Credit Reports

18. The three credit bureaus, TransUnion, Experian, and Equifax, allow credit reporting companies to purchase a merged credit report containing information from all three bureaus (a "3B Report"). (11/2 Tr. AM 11:19-12:2.) The bureaus have reciprocity agreements between them that address the costs the bureaus pay to each other when using another's data. (Id.) Under these agreements, each bureau is allowed some negotiation with credit reporting companies over the price of credit reports. (Deposition Transcript of Ken Greaux ("Greaux Depo. Tr."), Dkt. No. 230-13, at 44:11-45:8, 144:12-19.)

19. Pentius negotiated and agreed to contracts to obtain credit data from each of the three credit bureaus: TransUnion, Equifax, and Experian. (11/1 Tr. AM 128:23-129:15.) It was not an easy thing to do, and "very few companies go through the effort to contract [with] all three bureaus," which gave Pentius and later Array a unique competitive advantage. (Id.)

20. The 2015 contract between Pentius and TransUnion did not contain any provision regarding premium pricing for mergeable 1B reports. The 2015 agreement between Pentius and TransUnion defined Pentius' "Affiliates" as "any corporation, partnership or legal entity, which is controlled or owned by Pentius, Inc. or shall have common control and/or common ownership to Pentius, Inc." (Trial Ex. 485, at 1.) The 2015 agreement further defines Pentius and its Affiliates as "the Company." (Id.) The Court finds that Array, as part of the "Company," had the same rights under the agreement as Pentius, including the right to purchase consumer credit data to be used to support Array's customer relationships.

21. Before Pentius and Array were separated, Array relied on Pentius' agreements with each of the credit bureaus to obtain credit data, and it was written into each of the agreements that Array could obtain the data through the Pentius Agreement. (11/1 Tr. PM 15:1-14.) The Equifax agreement included an amendment that named Array as part of the transition, while the other two agreements with TransUnion and Experian allowed for Array to obtain data by permitting affiliated entities or entities under common ownership to share data. (Id.)

22. Array executed the agreement with DataOne, Inc. ("DataOne"), which is a company operated by Kevin Carroll, in October 2020. (Trial Ex. 212; 11/1 Tr. PM 92:10-19.) At the time the agreement was executed, Array was still a part of Pentius, which Toha owned. (11/1 Tr. PM 13:24-14:13.)

23. Ken Greaux of TransUnion testified that, in 2020, it was not a violation for Array to fulfill its customer contracts through the Pentius agreement. (11/2 Tr. PM 10:4-13, 62:18-21.) It also did not violate Pentius' agreement with TransUnion in 2020 to merge 3B reports, and there was no price "floor" or minimum price in the agreement. (11/2 Tr. AM 55:20-24.) ConsumerDirect admitted that Greaux would be in the best position to speak about TransUnion's pricing with Array and that there was nothing in Pentius' contract with TransUnion

in 2020 that prevented Array or Pentius from taking those actions. (10/31 Tr. PM 58:9-13; 11/3 Tr. PM 50:3-9.) Thus, the Court finds that Array's conduct with respect to DataOne was permitted by the 2015 agreement between Pentius and TransUnion.

24. The alleged contractual restrictions upon which ConsumerDirect relies were not added until a later agreement between Array and TransUnion, which was executed on November 15, 2021. (11/1 Tr. PM 39:3-40:25; Trial Ex. 492.) The Court finds that the DataOne/Kevin Carroll business relationship about which ConsumerDirect complains, which Array entered into in October 2020, did not violate Array's contractual obligations to TransUnion under the November 2021 contract.

25. TransUnion was aware of Array's association with Pentius. Ken Greaux testified that TransUnion knew that Array and Pentius were affiliated and shared common ownership. (11/2 Tr. AM 73:20-74:3.) When TransUnion requested that Pentius provide a list of URLs "where Pentius renders TransUnion data in the URL browser experience," Pentius disclosed Array white labels. (Trial Ex. 305, at 6.) The Court finds that this is consistent with Array's use of the 2015 agreement between Pentius and TransUnion as an affiliate of Pentius.

26. Based on the evidence, the Court finds that the contract between Pentius and CSID (on behalf of Experian) has never contained any provision regarding premium pricing for mergeable 1B reports.

27. The Court finds that Pentius compensated Equifax for its purchase of mergeable 1B reports.

28. All three of the credit bureaus accepted Pentius' and Array's ability to engage in merging the 1B credit reports into 3B reports. (11/1 Tr. AM 119:16-21.)

### D. Use of Credit Data Purchased by Pentius for Array's Clients

29. Based on the evidence presented at trial, the Court finds that during the extended transition of business functions from Pentius to Array, Pentius

purchased data under its contracts with the credit bureaus for the benefit of Array's white label clients.

30. The Court finds that Array and Pentius made the credit bureaus aware, and did not conceal, that during Array's and Pentius' business transition, Array was obtaining credit data for the benefit of its white label clients through Pentius' contracts and platform.

31. The Court finds that ConsumerDirect did not rely on any of the alleged representations it contends Array and Pentius made to the credit bureaus.

32. The Court finds that no consumers were misled or defrauded by any alleged misrepresentation ConsumerDirect contends Array or Pentius made to the credit bureaus.

## IV. CONCLUSIONS OF LAW

### A. Trademark Infringement Claim (15 U.S.C. § 1114) and False Designation of Origin Claim (15 U.S.C. § 1125(a))

33. To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party must prove: (1) that it has a protectable ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause consumer confusion. Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1144 (9th Cir. 2011) (citing Dep't of Parks & Recreation v. Bazaar Del Mundo Inc., 448 F.3d 1118, 1124 (9th Cir. 2006)).

34. To prevail under a false designation of origin or federal unfair competition claim, plaintiff must establish that it (1) has a valid, protectable trademark that (2) defendant is using in a confusingly similar manner. S. Cal. Darts Ass'n v. Zaffina, 762 F.3d 921, 929 (9th Cir. 2014). "The core element of trademark infringement is the likelihood of confusion, i.e., whether the similarity of the marks is likely to confuse customers about the source of the products." Freecycle Network, Inc. v. Oey, 505 F.3d 898, 902 (9th Cir. 2007) (quotations omitted).

35. Thus, a claim for false designation of origin under 15 U.S.C. § 1125 requires proof of the same elements as a claim for trademark infringement under 15 U.S.C. § 1114. Brookfield Communs., Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1046 n.6 (9th Cir. 1999).

36. There are three ways in which a party can establish it has a protectable interest in a mark: "(1) it has a federally registered mark in goods or services; (2) its mark is descriptive but has acquired a secondary meaning in the market; or (3) it has a suggestive mark, which is inherently distinctive and protectable." Applied Info. Scis. Corp. v. eBay, Inc., 511 F.3d 966, 969–70 (9th Cir. 2007).

37. Here, ConsumerDirect owns federal registrations for SMARTCREDIT and SMARTCREDIT.com. (Final Pre-Trial Conference Order at 3–4.) Thus, the Court concludes that ConsumerDirect has a valid, protectable trademark.

38. However, based on the evidence presented at trial, the Court concludes that neither Array nor Pentius—as opposed to third-party CTH Skin Corp.—"used" the SmartCredit mark. Neither Array nor Pentius were responsible for any potential infringements under the white label agreement. (Trial Ex. 360; 11/1 Tr. PM 64:13-65:24.) This is consistent with the responsibilities ConsumerDirect imposes on its own white label partners. (11/3 Tr. PM 54:9-55:12.)

39. Moreover, to establish contributory liability for either claim, ConsumerDirect must prove that Array and Pentius (1) "continued to supply [their] services to [a third party] it knew or had reason to know was engaging in trademark infringement" and (2) had "direct control and monitoring of the instrumentality used by [the] third party to infringe" the smartcreditview.com mark. See Louis Vuitton Malletier, S.A. v. Akanoc Sols., Inc., 658 F.3d 936, 942 (9th Cir. 2011) (internal quotation marks omitted); see also BioCell Tech. LLC v. Arthro-7, No. 12-00516, 2012 WL 12892937, at *12 (C.D. Cal. Nov. 19, 2012).

40. ConsumerDirect did not notify Array or Pentius of its infringement claim until it sent its demand letter in November 2021. (Trial Ex. 131; 11/1 Tr. PM 74:13-76:10; 11/3 Tr. AM 73:24-74:4.) By that point, CTH Skin Corp. ceased its own use of the allegedly infringing domain smartcreditview.com. (Trial Ex. 131; 11/1 Tr. PM 74:13-76:10; 11/3 Tr. AM 73:24-74:4.) Based on the evidence presented, the Court concludes that neither Array nor Pentius continued to supply their services to CTH Skin Corp. when they knew or had reason to know that smartcreditview.com was allegedly engaging in trademark infringement.

41. Thus, the Court concludes that neither Array nor Pentius can be contributorily liable for trademark infringement and false designation of origin.

42. The jury returned an advisory verdict in favor of Array and Pentius on ConsumerDirect's claims for trademark infringement and false designation of origin. (Dkt. No. 501.) When a claim is submitted to an advisory jury, "the court is free to accept or reject the jury's advisory verdict in making its own findings." Harris v. Sec'y. U.S. Dep't of Army, 119 F.3d 1313, 1320 (8th Cir. 1997). Compare 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2335 (3d ed. 2019) ("An advisory jury is an aid to the court in discharging its functions."), with Hunter v. Town of Mocksville, 897 F.3d 538, 563 (4th Cir. 2018) (an advisory verdict "is of no binding legal significance"), and 9 Charles A. Wright et al., Federal 26 Practice & Procedure § 2335 (3d ed.) (courts finding deference owed to an advisory verdict "misconceive the function of an advisory jury and seem to overlook the complete freedom the trial judge has in using or disregarding its findings"). While the Court has conducted its own analysis, the Court notes that the jury's advisory verdict also supports the Court's conclusion that ConsumerDirect has failed to prove, by a preponderance of the evidence, its claims for trademark infringement and false designation of origin. See, e.g., Ohio House LLC v. City of Costa Mesa, No. 19-1710, 2022 WL 18284404, at *14 (C.D. Cal. Aug. 26, 2022).

**B.     California Business and Professions Code § 17200 Claim**

43.     California's Unfair Competition Law (UCL) prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.[1]

44.     In its prior order, the Court granted summary judgment to Array and Pentius on the unfair prong of the UCL claim. (Dkt. No. 311, at 20–23 (sealed).)

45.     A business act is fraudulent within the meaning of § 17200 if "members of the public are likely to be deceived." Comm. on Children's Television v. Gen. Foods Corp., 35 Cal. 4th 197, 211 (1983). "Claims brought under the fraudulent prong under the UCL or sounding in fraud must satisfy Rule 9(b)." AK Futures v. Limitless Trading Co., LLC, No. 21-cv-01154, 2021 U.S. Dist. LEXIS 219445, at *15 (C.D. Cal. Oct. 6, 2021) (citing Faulk v. Sears, Reobuck & Co., No. 11-2159, 2011 U.S. Dist. LEXIS 131792, at *14 (N.D. Cal. Nov. 14, 2011); Kearns v. Ford Motor Co., 567 F.3d 1120, 1125 (9th Cir. 2009) (holding that where plaintiff alleges unified course of fraudulent conduct and relies entirely on that conduct as the basis of the claim, the claim is grounded in fraud and must satisfy Rule 9(b))).

46.     ConsumerDirect alleges that Array and Pentius made misrepresentations to the credit bureaus to conceal Array's and Pentius' improper use of credit data purchased by Pentius for the benefit of Array's white label clients. ConsumerDirect also alleges that Array and Pentius competed unfairly and violated their agreements with the credit bureaus by purchasing credit reports from credit bureaus individually, at lower prices, and using their own technology to merge the individual reports into 3B Reports without paying the premium 3B prices. However, based on the evidence presented at trial, the Court concludes that there are no clear and cognizable rules or industry standards that prohibited Array

---

[1] This is a different standard than is required for common law fraud.

or Pentius from leveraging their technology to purchase credit reports from credit bureaus individually, at lower prices, and then merge them into 3B Reports without paying the premium 3B prices.

47. The primary agreement that is the focus of ConsumerDirect's legal claim is an agreement between Array and DataOne. ConsumerDirect argues that Array was able to offer Kevin Carroll artificially low prices by violating Array's and Pentius' agreements with credit bureaus that allegedly prohibited merging three credit reports from each credit bureau into a 3B Report for less than premium pricing.

48. Based on the evidence presented at trial, the Court concludes that Array's and Pentius' use of their contracts and merging technology, which lowered prices for customers, violated no rules, agreements, or industry standards. Array and Pentius' conduct was consistent with their contractual rights under the agreements with the credit bureaus. The Court concludes that no members of the public were deceived or likely to be deceived by Array's and Pentius' pricing and merging practice. The consumers who obtained 3B credit reports that were merged by Array and Pentius were not defrauded or misled in any way.

49. Thus, the Court concludes that ConsumerDirect has not proven, by a preponderance of the evidence, that Array or Pentius violated California Business and Professions Code § 17200.

## V. Conclusion

For the reasons stated above, the Court enters its findings of fact and conclusions of law as stated herein. Defendants shall file a proposed judgment forthwith. Plaintiff shall file any objections thereto within 7 days of the other party's filing. If no objections are received within 7 days, the judgment will be

entered immediately, and Federal Rule of Civil Procedure 52(b) will apply upon entry of judgment.

**IT IS SO ORDERED.**

Dated: August 9, 2024

JAMES V. SELNA
UNITED STATES DISTRICT JUDGE